70 F.3d 232
 64 USLW 2231
 S. KADIC, on her own behalf and on behalf of her infant sons
Benjamin and Ognjen, Internationalna Iniciativa
Zena Bosne I Hercegovine "Biser," and
Zene Bosne I Hercegovine,
Plaintiffs-Appellants,
v.
Radovan KARADZIC, Defendant-Appellee.
Jane DOE I, on behalf of herself and all others similarly
situated; and Jane Doe II, on behalf of herself and as
administratrix of the estate of her deceased mother, and on
behalf of all others similarly situated, Plaintiffs-Appellants,
v.
Radovan KARADZIC, Defendant-Appellee.
 Nos. 1541, 1544, Dockets 94-9035, 94-9069.
 United States Court of Appeals,
Second Circuit.
 Argued June 20, 1995.
Decided Oct. 13, 1995.
Rehearing Denied Jan. 6, 1996.
 
 Beth Stephens, New York City (Matthew J. Chachere, Jennifer Green, Peter Weiss, Michael Ratner, Jules Lobel, Center for Constitutional Rights, New York City; Rhonda Copelon, Celina Romany, International Women's Human Rights Clinic, Flushing, NY; Judith Levin, International League of Human Rights, New York City; Harold Hongju Koh, Ronald C. Slye, Swati Agrawal, Bruce Brown, Charlotte Burrows, Carl Goldfarb, Linda Keller, Jon Levitsky, Daniyal Mueenuddin, Steve Parker, Maxwell S. Peltz, Amy Valley, Wendy Weiser, Allard K. Lowenstein International Human Rights Clinic, New Haven, CT, on the brief), for plaintiffs-appellants, Jane Doe I and Jane Doe II.
 Catharine A. MacKinnon, Ann Arbor, MI (Martha F. Davis, Deborah A. Ellis, Yolanda S. Wu, NOW Legal Defense and Education Fund, New York City, on the brief), for plaintiffs-appellants Kadic, Internationalna Iniciativa Zena Bosne I Hercegovine, and Zena Bosne I Hercegovine.
 Ramsey Clark, New York City (Lawrence W. Schilling, New York City, on the brief), for defendant-appellee.
 Drew S. Days, III, Solicitor General, and Conrad K. Harper, Legal Adviser, Department of State, Washington, DC, submitted a Statement of Interest of the U.S.; Frank W. Hunger, Asst. Atty. Gen., and Douglas Letter, Appellate Litigation Counsel, on the brief.
 Karen Honeycut, Vladeck, Waldman, Elias & Engelhard, New York, NY, submitted a brief for amici curiae Law Professors Frederick M. Abbott, et al.
 Nancy Kelly, Women Refugee Project, Harvard Immigration and Refugee Program, Cambridge and Somerville Legal Services, Cambridge, Mass., submitted a brief for amici curiae Alliances--an African Women's Network, et al.
 Juan E. Mendez, Joanne Mariner, Washington, DC; Professor Ralph G. Steinhardt, George Washington University School of Law, Washington, DC; Paul L. Hoffman, Santa Monica, CA; Professor Joan Fitzpatrick, University of Washington School of Law, Seattle, WA, submitted a brief for amicus curiae Human Rights Watch.
 Stephen M. Schneebaum, Washington, DC, submitted a brief for amici curiae The International Human Rights Law Group, et al.
 Before: NEWMAN, Chief Judge, FEINBERG and WALKER, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 Most Americans would probably be surprised to learn that victims of atrocities committed in Bosnia are suing the leader of the insurgent Bosnian-Serb forces in a United States District Court in Manhattan. Their claims seek to build upon the foundation of this Court's decision in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), which recognized the important principle that the venerable Alien Tort Act, 28 U.S.C. Sec. 1350 (1988), enacted in 1789 but rarely invoked since then, validly creates federal court jurisdiction for suits alleging torts committed anywhere in the world against aliens in violation of the law of nations. The pending appeals pose additional significant issues as to the scope of the Alien Tort Act: whether some violations of the law of nations may be remedied when committed by those not acting under the authority of a state; if so, whether genocide, war crimes, and crimes against humanity are among the violations that do not require state action; and whether a person, otherwise liable for a violation of the law of nations, is immune from service of process because he is present in the United States as an invitee of the United Nations.
 
 
 2
 These issues arise on appeals by two groups of plaintiffs-appellants from the November 19, 1994, judgment of the United States District Court for the Southern District of New York (Peter K. Leisure, Judge), dismissing, for lack of subject-matter jurisdiction, their suits against defendant-appellee Radovan Karadzic, President of the self-proclaimed Bosnian-Serb republic of "Srpska." Doe v. Karadzic, 866 F.Supp. 734 (S.D.N.Y.1994) ("Doe"). For the reasons set forth below, we hold that subject-matter jurisdiction exists, that Karadzic may be found liable for genocide, war crimes, and crimes against humanity in his private capacity and for other violations in his capacity as a state actor, and that he is not immune from service of process. We therefore reverse and remand.
 
 Background
 
 3
 The plaintiffs-appellants are Croat and Muslim citizens of the internationally recognized nation of Bosnia-Herzegovina, formerly a republic of Yugoslavia. Their complaints, which we accept as true for purposes of this appeal, allege that they are victims, and representatives of victims, of various atrocities, including brutal acts of rape, forced prostitution, forced impregnation, torture, and summary execution, carried out by Bosnian-Serb military forces as part of a genocidal campaign conducted in the course of the Bosnian civil war. Karadzic, formerly a citizen of Yugoslavia and now a citizen of Bosnia-Herzegovina, is the President of a three-man presidency of the self-proclaimed Bosnian-Serb republic within Bosnia-Herzegovina, sometimes referred to as "Srpska," which claims to exercise lawful authority, and does in fact exercise actual control, over large parts of the territory of Bosnia-Herzegovina. In his capacity as President, Karadzic possesses ultimate command authority over the Bosnian-Serb military forces, and the injuries perpetrated upon plaintiffs were committed as part of a pattern of systematic human rights violations that was directed by Karadzic and carried out by the military forces under his command. The complaints allege that Karadzic acted in an official capacity either as the titular head of Srpska or in collaboration with the government of the recognized nation of the former Yugoslavia and its dominant constituent republic, Serbia.
 
 
 4
 The two groups of plaintiffs asserted causes of action for genocide, rape, forced prostitution and impregnation, torture and other cruel, inhuman, and degrading treatment, assault and battery, sex and ethnic inequality, summary execution, and wrongful death. They sought compensatory and punitive damages, attorney's fees, and, in one of the cases, injunctive relief. Plaintiffs grounded subject-matter jurisdiction in the Alien Tort Act, the Torture Victim Protection Act of 1991 ("Torture Victim Act"), Pub.L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. Sec. 1350 note (Supp. V 1993), the general federal-question jurisdictional statute, 28 U.S.C. Sec. 1331 (1988), and principles of supplemental jurisdiction, 28 U.S.C. Sec. 1367 (Supp. V 1993).
 
 
 5
 In early 1993, Karadzic was admitted to the United States on three separate occasions as an invitee of the United Nations. According to affidavits submitted by the plaintiffs, Karadzic was personally served with the summons and complaint in each action during two of these visits while he was physically present in Manhattan. Karadzic admits that he received the summons and complaint in the Kadic action, but disputes whether the attempt to serve him personally in the Doe action was effective.
 
 
 6
 In the District Court, Karadzic moved for dismissal of both actions on the grounds of insufficient service of process, lack of personal jurisdiction, lack of subject-matter jurisdiction, and nonjusticiability of plaintiffs' claims. However, Karadzic submitted a memorandum of law and supporting papers only on the issues of service of process and personal jurisdiction, while reserving the issues of subject-matter jurisdiction and nonjusticiability for further briefing, if necessary. The plaintiffs submitted papers responding only to the issues raised by the defendant.
 
 
 7
 Without notice or a hearing, the District Court by-passed the issues briefed by the parties and dismissed both actions for lack of subject-matter jurisdiction. In an Opinion and Order, reported at 866 F.Supp. 734, the District Judge preliminarily noted that the Court might be deprived of jurisdiction if the Executive Branch were to recognize Karadzic as the head of state of a friendly nation, see Lafontant v. Aristide, 844 F.Supp. 128 (E.D.N.Y.1994) (head-of-state immunity), and that this possibility could render the plaintiffs' pending claims requests for an advisory opinion. The District Judge recognized that this consideration was not dispositive but believed that it "militates against this Court exercising jurisdiction." Doe, 866 F.Supp. at 738.
 
 
 8
 Turning to the issue of subject-matter jurisdiction under the Alien Tort Act, the Court concluded that "acts committed by non-state actors do not violate the law of nations," id. at 739. Finding that "[t]he current Bosnian-Serb warring military faction does not constitute a recognized state," id. at 741, and that "the members of Karadzic's faction do not act under the color of any recognized state law," id., the Court concluded that "the acts alleged in the instant action[s], while grossly repugnant, cannot be remedied through [the Alien Tort Act]," id. at 740-41. The Court did not consider the plaintiffs' alternative claim that Karadzic acted under color of law by acting in concert with the Serbian Republic of the former Yugoslavia, a recognized nation.
 
 
 9
 The District Judge also found that the apparent absence of state action barred plaintiffs' claims under the Torture Victim Act, which expressly requires that an individual defendant act "under actual or apparent authority, or color of law, of any foreign nation," Torture Victim Act Sec. 2(a). With respect to plaintiffs' further claims that the law of nations, as incorporated into federal common law, gives rise to an implied cause of action over which the Court would have jurisdiction pursuant to section 1331, the Judge found that the law of nations does not give rise to implied rights of action absent specific Congressional authorization, and that, in any event, such an implied right of action would not lie in the absence of state action. Finally, having dismissed all of plaintiffs' federal claims, the Court declined to exercise supplemental jurisdiction over their state-law claims.
 
 Discussion
 
 10
 Though the District Court dismissed for lack of subject-matter jurisdiction, the parties have briefed not only that issue but also the threshold issues of personal jurisdiction and justiciability under the political question doctrine. Karadzic urges us to affirm on any one of these three grounds. We consider each in turn.
 
 I. Subject-Matter Jurisdiction
 
 11
 Appellants allege three statutory bases for the subject-matter jurisdiction of the District Court--the Alien Tort Act, the Torture Victim Act, and the general federal-question jurisdictional statute.
 
 A. The Alien Tort Act
 
 12
 1. General Application to Appellants' Claims
 
 The Alien Tort Act provides:
 
 13
 The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.
 
 
 14
 28 U.S.C. Sec. 1350 (1988). Our decision in Filartiga established that this statute confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law).[1] 630 F.2d at 887; see also Amerada Hess Shipping Corp. v. Argentine Republic, 830 F.2d 421, 425 (2d Cir.1987), rev'd on other grounds, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The first two requirements are plainly satisfied here, and the only disputed issue is whether plaintiffs have pleaded violations of international law.
 
 
 15
 Because the Alien Tort Act requires that plaintiffs plead a "violation of the law of nations" at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible "arising under" formula of section 1331. See Filartiga, 630 F.2d at 887-88. Thus, it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations. There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States).
 
 
 16
 Filartiga established that courts ascertaining the content of the law of nations "must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." Id. at 881; see also Amerada Hess, 830 F.2d at 425. We find the norms of contemporary international law by " 'consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.' " Filartiga, 630 F.2d at 880 (quoting United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61, 5 L.Ed. 57 (1820)). If this inquiry discloses that the defendant's alleged conduct violates "well-established, universally recognized norms of international law," id. at 888, as opposed to "idiosyncratic legal rules," id. at 881, then federal jurisdiction exists under the Alien Tort Act.
 
 
 17
 Karadzic contends that appellants have not alleged violations of the norms of international law because such norms bind only states and persons acting under color of a state's law, not private individuals. In making this contention, Karadzic advances the contradictory positions that he is not a state actor, see Brief for Appellee at 19, even as he asserts that he is the President of the self-proclaimed Republic of Srpska, see statement of Radovan Karadzic, May 3, 1993, submitted with Defendant's Motion to Dismiss. For their part, the Kadic appellants also take somewhat inconsistent positions in pleading defendant's role as President of Srpska, Kadic Complaint p 13, and also contending that "Karadzic is not an official of any government," Kadic Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss at 21 n. 25.
 
 
 18
 Judge Leisure accepted Karadzic's contention that "acts committed by non-state actors do not violate the law of nations," Doe, 866 F.Supp. at 739, and considered him to be a non-state actor.[2] The Judge appears to have deemed state action required primarily on the basis of cases determining the need for state action as to claims of official torture, see, e.g., Carmichael v. United Technologies Corp., 835 F.2d 109 (5th Cir.1988), without consideration of the substantial body of law, discussed below, that renders private individuals liable for some international law violations.
 
 
 19
 We do not agree that the law of nations, as understood in the modern era, confines its reach to state action. Instead, we hold that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals. An early example of the application of the law of nations to the acts of private individuals is the prohibition against piracy. See United States v. Smith, 18 U.S. (5 Wheat.) 153, 161, 5 L.Ed. 57 (1820); United States v. Furlong, 18 U.S. (5 Wheat.) 184, 196-97, 5 L.Ed. 64 (1820). In The Brig Malek Adhel, 43 U.S. (2 How.) 210, 232, 11 L.Ed. 239 (1844), the Supreme Court observed that pirates were "hostis humani generis" (an enemy of all mankind) in part because they acted "without ... any pretense of public authority." See generally 4 William Blackstone, Commentaries on the Laws of England 68 (facsimile of 1st ed. 1765-1769, Univ. of Chi. ed., 1979). Later examples are prohibitions against the slave trade and certain war crimes. See M. Cherif Bassiouni, Crimes Against Humanity in International Criminal Law 193 (1992); Jordan Paust, The Other Side of Right: Private Duties Under Human Rights Law, 5 Harv.Hum.Rts.J. 51 (1992).
 
 
 20
 The liability of private persons for certain violations of customary international law and the availability of the Alien Tort Act to remedy such violations was early recognized by the Executive Branch in an opinion of Attorney General Bradford in reference to acts of American citizens aiding the French fleet to plunder British property off the coast of Sierra Leone in 1795. See Breach of Neutrality, 1 Op. Att'y Gen. 57, 59 (1795). The Executive Branch has emphatically restated in this litigation its position that private persons may be found liable under the Alien Tort Act for acts of genocide, war crimes, and other violations of international humanitarian law. See Statement of Interest of the United States at 5-13.
 
 
 21
 The Restatement (Third) of the Foreign Relations Law of the United States (1986) ("Restatement (Third) ") proclaims: "Individuals may be held liable for offenses against international law, such as piracy, war crimes, and genocide." Restatement (Third) pt. II, introductory note. The Restatement is careful to identify those violations that are actionable when committed by a state, Restatement (Third) Sec. 702,[3] and a more limited category of violations of "universal concern," id. Sec. 404,[4] partially overlapping with those listed in section 702. Though the immediate focus of section 404 is to identify those offenses for which a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders, cf. id. Sec. 402(1)(a), (2), the inclusion of piracy and slave trade from an earlier era and aircraft hijacking from the modern era demonstrates that the offenses of "universal concern" include those capable of being committed by non-state actors. Although the jurisdiction authorized by section 404 is usually exercised by application of criminal law, international law also permits states to establish appropriate civil remedies, id. Sec. 404 cmt. b, such as the tort actions authorized by the Alien Tort Act. Indeed, the two cases invoking the Alien Tort Act prior to Filartiga both applied the civil remedy to private action. See Adra v. Clift, 195 F.Supp. 857 (D.Md.1961); Bolchos v. Darrel, 3 F.Cas. 810 (D.S.C.1795) (No. 1,607).
 
 
 22
 Karadzic disputes the application of the law of nations to any violations committed by private individuals, relying on Filartiga and the concurring opinion of Judge Edwards in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 775 (D.C.Cir.1984), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).[5] Filartiga involved an allegation of torture committed by a state official. Relying on the United Nations' Declaration on the Protection of All Persons from Being Subjected to Torture, G.A.Res. 3452, U.N. GAOR, U.N. Doc. A/1034 (1975) (hereinafter "Declaration on Torture"), as a definitive statement of norms of customary international law prohibiting states from permitting torture, we ruled that "official torture is now prohibited by the law of nations." Filartiga, 630 F.2d at 884 (emphasis added). We had no occasion to consider whether international law violations other than torture are actionable against private individuals, and nothing in Filartiga purports to preclude such a result.
 
 
 23
 Nor did Judge Edwards in his scholarly opinion in Tel-Oren reject the application of international law to any private action. On the contrary, citing piracy and slave-trading as early examples, he observed that there exists a "handful of crimes to which the law of nations attributes individual responsibility," 726 F.2d at 795. Reviewing authorities similar to those consulted in Filartiga, he merely concluded that torture--the specific violation alleged in Tel-Oren--was not within the limited category of violations that do not require state action.
 
 
 24
 Karadzic also contends that Congress intended the state-action requirement of the Torture Victim Act to apply to actions under the Alien Tort Act. We disagree. Congress enacted the Torture Victim Act to codify the cause of action recognized by this Circuit in Filartiga, and to further extend that cause of action to plaintiffs who are U.S. citizens. See H.R.Rep. No. 367, 102d Cong., 2d Sess., at 4 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86 (explaining that codification of Filartiga was necessary in light of skepticism expressed by Judge Bork's concurring opinion in Tel-Oren ). At the same time, Congress indicated that the Alien Tort Act "has other important uses and should not be replaced," because
 
 
 25
 Claims based on torture and summary executions do not exhaust the list of actions that may appropriately be covered [by the Alien Tort Act]. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.
 
 
 26
 Id. The scope of the Alien Tort Act remains undiminished by enactment of the Torture Victim Act.
 
 
 27
 2. Specific Application of Alien Tort Act to Appellants' Claims
 
 
 28
 In order to determine whether the offenses alleged by the appellants in this litigation are violations of the law of nations that may be the subject of Alien Tort Act claims against a private individual, we must make a particularized examination of these offenses, mindful of the important precept that "evolving standards of international law govern who is within the [Alien Tort Act's] jurisdictional grant." Amerada Hess, 830 F.2d at 425. In making that inquiry, it will be helpful to group the appellants' claims into three categories: (a) genocide, (b) war crimes, and (c) other instances of inflicting death, torture, and degrading treatment.
 
 
 29
 (a) Genocide. In the aftermath of the atrocities committed during the Second World War, the condemnation of genocide as contrary to international law quickly achieved broad acceptance by the community of nations. In 1946, the General Assembly of the United Nations declared that genocide is a crime under international law that is condemned by the civilized world, whether the perpetrators are "private individuals, public officials or statesmen." G.A.Res. 96(I), 1 U.N.GAOR, U.N. Doc. A/64/Add.1, at 188-89 (1946). The General Assembly also affirmed the principles of Article 6 of the Agreement and Charter Establishing the Nuremberg War Crimes Tribunal for punishing " 'persecutions on political, racial, or religious grounds,' " regardless of whether the offenders acted " 'as individuals or as members of organizations,' " In re Extradition of Demjanjuk, 612 F.Supp. 544, 555 n. 11 (N.D.Ohio 1985) (quoting Article 6). See G.A.Res. 95(I), 1 U.N.GAOR, U.N.Doc. A/64/Add.1, at 188 (1946).
 
 
 30
 The Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S. 277, entered into force Jan. 12, 1951, for the United States Feb. 23, 1989 (hereinafter "Convention on Genocide"), provides a more specific articulation of the prohibition of genocide in international law. The Convention, which has been ratified by more than 120 nations, including the United States, see U.S. Dept. of State, Treaties in Force 345 (1994), defines "genocide" to mean
 
 
 31
 any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
 
 
 32
 (a) Killing members of the group;
 
 
 33
 (b) Causing serious bodily or mental harm to members of the group;
 
 
 34
 (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
 
 
 35
 (d) Imposing measures intended to prevent births with the group;
 
 
 36
 (e) Forcibly transferring children of the group to another group.
 
 
 37
 Convention on Genocide art. II. Especially pertinent to the pending appeal, the Convention makes clear that "[p]ersons committing genocide ... shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals." Id. art. IV (emphasis added). These authorities unambiguously reflect that, from its incorporation into international law, the proscription of genocide has applied equally to state and non-state actors.
 
 
 38
 The applicability of this norm to private individuals is also confirmed by the Genocide Convention Implementation Act of 1987, 18 U.S.C. Sec. 1091 (1988), which criminalizes acts of genocide without regard to whether the offender is acting under color of law, see id. Sec. 1091(a) ("[w]hoever" commits genocide shall be punished), if the crime is committed within the United States or by a U.S. national, id. Sec. 1091(d). Though Congress provided that the Genocide Convention Implementation Act shall not "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding," id. Sec. 1092, the legislative decision not to create a new private remedy does not imply that a private remedy is not already available under the Alien Tort Act. Nothing in the Genocide Convention Implementation Act or its legislative history reveals an intent by Congress to repeal the Alien Tort Act insofar as it applies to genocide,[6] and the two statutes are surely not repugnant to each other. Under these circumstances, it would be improper to construe the Genocide Convention Implementation Act as repealing the Alien Tort Act by implication. See Rodriguez v. United States, 480 U.S. 522, 524, 107 S.Ct. 1391, 1392, 94 L.Ed.2d 533 (1987) ("[R]epeals by implication are not favored and will not be found unless an intent to repeal is clear and manifest.") (citations and internal quotation marks omitted); United States v. Cook, 922 F.2d 1026, 1034 (2d Cir.) ("mutual exclusivity" of statutes is required to demonstrate Congress's "clear, affirmative intent to repeal"), cert. denied, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).
 
 
 39
 Appellants' allegations that Karadzic personally planned and ordered a campaign of murder, rape, forced impregnation, and other forms of torture designed to destroy the religious and ethnic groups of Bosnian Muslims and Bosnian Croats clearly state a violation of the international law norm proscribing genocide, regardless of whether Karadzic acted under color of law or as a private individual. The District Court has subject-matter jurisdiction over these claims pursuant to the Alien Tort Act.
 
 
 40
 (b) War crimes. Plaintiffs also contend that the acts of murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities, violate the law of war. Atrocities of the types alleged here have long been recognized in international law as violations of the law of war. See In re Yamashita, 327 U.S. 1, 14, 66 S.Ct. 340, 347, 90 L.Ed. 499 (1946). Moreover, international law imposes an affirmative duty on military commanders to take appropriate measures within their power to control troops under their command for the prevention of such atrocities. Id. at 15-16, 66 S.Ct. at 347-48.
 
 
 41
 After the Second World War, the law of war was codified in the four Geneva Conventions,[7] which have been ratified by more than 180 nations, including the United States, see Treaties in Force, supra, at 398-99. Common article 3, which is substantially identical in each of the four Conventions, applies to "armed conflict[s] not of an international character" and binds "each Party to the conflict ... to apply, as a minimum, the following provisions":
 
 
 42
 Persons taking no active part in the hostilities ... shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.
 
 
 43
 To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
 
 
 44
 (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
 
 
 45
 (b) taking of hostages;
 
 
 46
 (c) outrages upon personal dignity, in particular humiliating and degrading treatment;
 
 
 47
 (d) the passing of sentences and carrying out of executions without previous judgment pronounced by a regularly constituted court....
 
 
 48
 Geneva Convention I art. 3(1). Thus, under the law of war as codified in the Geneva Conventions, all "parties" to a conflict--which includes insurgent military groups--are obliged to adhere to these most fundamental requirements of the law of war.[8]
 
 
 49
 The offenses alleged by the appellants, if proved, would violate the most fundamental norms of the law of war embodied in common article 3, which binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents. The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II, see Telford Taylor, Nuremberg Trials: War Crimes and International Law, 450 Int'l Conciliation 304 (April 1949) (collecting cases), and remains today an important aspect of international law, see Jordan Paust, After My Lai: The Case for War Crimes Jurisdiction Over Civilians in Federal District Courts, in 4 The Vietnam War and International Law 447 (R.Falk ed., 1976). The District Court has jurisdiction pursuant to the Alien Tort Act over appellants' claims of war crimes and other violations of international humanitarian law.
 
 
 50
 (c) Torture and summary execution. In Filartiga, we held that official torture is prohibited by universally accepted norms of international law, see 630 F.2d at 885, and the Torture Victim Act confirms this holding and extends it to cover summary execution. Torture Victim Act Secs. 2(a), 3(a). However, torture and summary execution--when not perpetrated in the course of genocide or war crimes--are proscribed by international law only when committed by state officials or under color of law. See Declaration on Torture art. 1 (defining torture as being "inflicted by or at the instigation of a public official"); Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment pt. I, art. 1, 23 I.L.M. 1027 (1984), as modified, 24 I.L.M. 535 (1985), entered into force June 26, 1987, ratified by United States Oct. 21, 1994, 34 I.L.M. 590, 591 (1995) (defining torture as "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity"); Torture Victim Act Sec. 2(a) (imposing liability on individuals acting "under actual or apparent authority, or color of law, of any foreign nation").
 
 
 51
 In the present case, appellants allege that acts of rape, torture, and summary execution were committed during hostilities by troops under Karadzic's command and with the specific intent of destroying appellants' ethnic-religious groups. Thus, many of the alleged atrocities are already encompassed within the appellants' claims of genocide and war crimes. Of course, at this threshold stage in the proceedings it cannot be known whether appellants will be able to prove the specific intent that is an element of genocide, or prove that each of the alleged torts were committed in the course of an armed conflict, as required to establish war crimes. It suffices to hold at this stage that the alleged atrocities are actionable under the Alien Tort Act, without regard to state action, to the extent that they were committed in pursuit of genocide or war crimes, and otherwise may be pursued against Karadzic to the extent that he is shown to be a state actor. Since the meaning of the state action requirement for purposes of international law violations will likely arise on remand and has already been considered by the District Court, we turn next to that requirement.
 
 
 52
 3. The State Action Requirement for International Law Violations
 
 
 53
 In dismissing plaintiffs' complaints for lack of subject-matter jurisdiction, the District Court concluded that the alleged violations required state action and that the "Bosnian-Serb entity" headed by Karadzic does not meet the definition of a state. Doe, 866 F.Supp. at 741 n. 12. Appellants contend that they are entitled to prove that Srpska satisfies the definition of a state for purposes of international law violations and, alternatively, that Karadzic acted in concert with the recognized state of the former Yugoslavia and its constituent republic, Serbia.
 
 
 54
 (a) Definition of a state in international law. The definition of a state is well established in international law:
 
 
 55
 Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities.
 
 
 56
 Restatement (Third) Sec. 201; accord Klinghoffer, 937 F.2d at 47; National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 553 (2d Cir.1988); see also Texas v. White, 74 U.S. (7 Wall.) 700, 720, 19 L.Ed. 227 (1868). "[A]ny government, however violent and wrongful in its origin, must be considered a de facto government if it was in the full and actual exercise of sovereignty over a territory and people large enough for a nation." Ford v. Surget, 97 U.S. (7 Otto) 594, 620, 24 L.Ed. 1018 (1878) (Clifford, J., concurring).
 
 
 57
 Although the Restatement's definition of statehood requires the capacity to engage in formal relations with other states, it does not require recognition by other states. See Restatement (Third) Sec. 202 cmt. b ("An entity that satisfies the requirements of Sec. 201 is a state whether or not its statehood is formally recognized by other states."). Recognized states enjoy certain privileges and immunities relevant to judicial proceedings, see, e.g., Pfizer Inc. v. India, 434 U.S. 308, 318-20, 98 S.Ct. 584, 590-91, 54 L.Ed.2d 563 (1978) (diversity jurisdiction); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 408-12, 84 S.Ct. 923, 929-32, 11 L.Ed.2d 804 (1964) (access to U.S. courts); Lafontant, 844 F.Supp. at 131 (head-of-state immunity), but an unrecognized state is not a juridical nullity. Our courts have regularly given effect to the "state" action of unrecognized states. See, e.g., United States v. Insurance Cos., 89 U.S. (22 Wall.) 99, 101-03, 22 L.Ed. 816 (1875) (seceding states in Civil War); Thorington v. Smith, 75 U.S. (8 Wall.) 1, 9-12, 19 L.Ed. 361 (1868) (same); Carl Zeiss Stiftung v. VEB Carl Zeiss Jena, 433 F.2d 686, 699 (2d Cir.1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971) (post-World War II East Germany).
 
 
 58
 The customary international law of human rights, such as the proscription of official torture, applies to states without distinction between recognized and unrecognized states. See Restatement (Third) Secs. 207, 702. It would be anomalous indeed if non-recognition by the United States, which typically reflects disfavor with a foreign regime--sometimes due to human rights abuses--had the perverse effect of shielding officials of the unrecognized regime from liability for those violations of international law norms that apply only to state actors.
 
 
 59
 Appellants' allegations entitle them to prove that Karadzic's regime satisfies the criteria for a state, for purposes of those international law violations requiring state action. Srpska is alleged to control defined territory, control populations within its power, and to have entered into agreements with other governments. It has a president, a legislature, and its own currency. These circumstances readily appear to satisfy the criteria for a state in all aspects of international law. Moreover, it is likely that the state action concept, where applicable for some violations like "official" torture, requires merely the semblance of official authority. The inquiry, after all, is whether a person purporting to wield official power has exceeded internationally recognized standards of civilized conduct, not whether statehood in all its formal aspects exists.
 
 
 60
 (b) Acting in concert with a foreign state. Appellants also sufficiently alleged that Karadzic acted under color of law insofar as they claimed that he acted in concert with the former Yugoslavia, the statehood of which is not disputed. The "color of law" jurisprudence of 42 U.S.C. Sec. 1983 is a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act. See Forti v. Suarez-Mason, 672 F.Supp. 1531, 1546 (N.D.Cal.1987), reconsideration granted in part on other grounds, 694 F.Supp. 707 (N.D.Cal.1988). A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753-54, 73 L.Ed.2d 482 (1982). The appellants are entitled to prove their allegations that Karadzic acted under color of law of Yugoslavia by acting in concert with Yugoslav officials or with significant Yugoslavian aid.
 
 B. The Torture Victim Protection Act
 
 61
 The Torture Victim Act, enacted in 1992, provides a cause of action for official torture and extrajudicial killing:
 
 
 62
 An individual who, under actual or apparent authority, or color of law, of any foreign nation--
 
 
 63
 (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
 
 
 64
 (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.
 
 
 65
 Torture Victim Act Sec. 2(a). The statute also requires that a plaintiff exhaust adequate and available local remedies, id. Sec. 2(b), imposes a ten-year statute of limitations, id. Sec. 2(c), and defines the terms "extrajudicial killing" and "torture," id. Sec. 3.
 
 
 66
 By its plain language, the Torture Victim Act renders liable only those individuals who have committed torture or extrajudicial killing "under actual or apparent authority, or color of law, of any foreign nation." Legislative history confirms that this language was intended to "make[ ] clear that the plaintiff must establish some governmental involvement in the torture or killing to prove a claim," and that the statute "does not attempt to deal with torture or killing by purely private groups." H.R.Rep. No. 367, 102d Cong., 2d Sess., at 5 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 87. In construing the terms "actual or apparent authority" and "color of law," courts are instructed to look to principles of agency law and to jurisprudence under 42 U.S.C. Sec. 1983, respectively. Id.
 
 
 67
 Though the Torture Victim Act creates a cause of action for official torture, this statute, unlike the Alien Tort Act, is not itself a jurisdictional statute. The Torture Victim Act permits the appellants to pursue their claims of official torture under the jurisdiction conferred by the Alien Tort Act and also under the general federal question jurisdiction of section 1331, see Xuncax v. Gramajo, 886 F.Supp. 162, 178 (D.Mass.1995), to which we now turn.
 
 C. Section 1331
 
 68
 The appellants contend that section 1331 provides an independent basis for subject-matter jurisdiction over all claims alleging violations of international law. Relying on the settled proposition that federal common law incorporates international law, see The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); In re Estate of Ferdinand E. Marcos Human Rights Litigation (Marcos I ), 978 F.2d 493, 502 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993); Filartiga, 630 F.2d at 886, they reason that causes of action for violations of international law "arise under" the laws of the United States for purposes of jurisdiction under section 1331. Whether that is so is an issue of some uncertainty that need not be decided in this case.
 
 
 69
 In Tel-Oren, Judge Edwards expressed the view that section 1331 did not supply jurisdiction for claimed violations of international law unless the plaintiffs could point to a remedy granted by the law of nations or argue successfully that such a remedy is implied. Tel-Oren, 726 F.2d at 779-80 n. 4. The law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations. Id. at 778 (Edwards, J., concurring). Some district courts, however, have upheld section 1331 jurisdiction for international law violations. See Abebe-Jiri v. Negewo, No. 90-2010 (N.D.Ga. Aug. 20, 1993), appeal argued, No. 93-9133 (11th Cir. Jan. 10, 1995); Martinez-Baca v. Suarez-Mason, No. 87-2057, slip op. at 4-5 (N.D.Cal. Apr. 22, 1988); Forti v. Suarez-Mason, 672 F.Supp. 1531, 1544 (N.D.Cal.1987).
 
 
 70
 We recognized the possibility of section 1331 jurisdiction in Filartiga, 630 F.2d at 887 n. 22, but rested jurisdiction solely on the applicable Alien Tort Act. Since that Act appears to provide a remedy for the appellants' allegations of violations related to genocide, war crimes, and official torture, and the Torture Victim Act also appears to provide a remedy for their allegations of official torture, their causes of action are statutorily authorized, and, as in Filartiga, we need not rule definitively on whether any causes of action not specifically authorized by statute may be implied by international law standards as incorporated into United States law and grounded on section 1331 jurisdiction.
 
 
 71
 II. Service of Process and Personal Jurisdiction
 
 
 72
 Appellants aver that Karadzic was personally served with process while he was physically present in the Southern District of New York. In the Doe action, the affidavits detail that on February 11, 1993, process servers approached Karadzic in the lobby of the Hotel Intercontinental at 111 East 48th St. in Manhattan, called his name and identified their purpose, and attempted to hand him the complaint from a distance of two feet, that security guards seized the complaint papers, and that the papers fell to the floor. Karadzic submitted an affidavit of a State Department security officer, who generally confirmed the episode, but stated that the process server did not come closer than six feet of the defendant. In the Kadic action, the plaintiffs obtained from Judge Owen an order for alternate means of service, directing service by delivering the complaint to a member of defendant's State Department security detail, who was ordered to hand the complaint to the defendant. The security officer's affidavit states that he received the complaint and handed it to Karadzic outside the Russian Embassy in Manhattan. Karadzic's statement confirms that this occurred during his second visit to the United States, sometime between February 27 and March 8, 1993. Appellants also allege that during his visits to New York City, Karadzic stayed at hotels outside the "headquarters district" of the United Nations and engaged in non-United Nations-related activities such as fund-raising.
 
 
 73
 Fed.R.Civ.P. 4(e)(2) specifically authorizes personal service of a summons and complaint upon an individual physically present within a judicial district of the United States, and such personal service comports with the requirements of due process for the assertion of personal jurisdiction. See Burnham v. Superior Court of California, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990).
 
 
 74
 Nevertheless, Karadzic maintains that his status as an invitee of the United Nations during his visits to the United States rendered him immune from service of process. He relies on both the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, reprinted at 22 U.S.C. Sec. 287 note (1988) ("Headquarters Agreement"), and a claimed federal common law immunity. We reject both bases for immunity from service.
 
 A. Headquarters Agreement
 
 75
 The Headquarters Agreement provides for immunity from suit only in narrowly defined circumstances. First, "service of legal process ... may take place within the headquarters district only with the consent of and under conditions approved by the Secretary-General." Id. Sec. 9(a). This provision is of no benefit to Karadzic, because he was not served within the well-defined confines of the "headquarters district," which is bounded by Franklin D. Roosevelt Drive, 1st Avenue, 42nd Street, and 48th Street, see id. annex 1. Second, certain representatives of members of the United Nations, whether residing inside or outside of the "headquarters district," shall be entitled to the same privileges and immunities as the United States extends to accredited diplomatic envoys. Id. Sec. 15. This provision is also of no benefit to Karadzic, since he is not a designated representative of any member of the United Nations.
 
 
 76
 A third provision of the Headquarters Agreement prohibits federal, state, and local authorities of the United States from "impos[ing] any impediments to transit to or from the headquarters district of ... persons invited to the headquarters district by the United Nations ... on official business." Id. Sec. 11. Karadzic maintains that allowing service of process upon a United Nations invitee who is on official business would violate this section, presumably because it would impose a potential burden--exposure to suit--on the invitee's transit to and from the headquarters district. However, this Court has previously refused "to extend the immunities provided by the Headquarters Agreement beyond those explicitly stated." See Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 48 (2d Cir.1991). We therefore reject Karadzic's proposed construction of section 11, because it would effectively create an immunity from suit for United Nations invitees where none is provided by the express terms of the Headquarters Agreement.[9]
 
 
 77
 The parties to the Headquarters Agreement agree with our construction of it. In response to a letter from plaintiffs' attorneys opposing any grant of immunity to Karadzic, a responsible State Department official wrote: "Mr. Karadzic's status during his recent visits to the United States has been solely as an 'invitee' of the United Nations, and as such he enjoys no immunity from the jurisdiction of the courts of the United States." Letter from Michael J. Habib, Director of Eastern European Affairs, U.S. Dept. of State, to Beth Stephens (Mar. 24, 1993) ("Habib Letter"). Counsel for the United Nations has also issued an opinion stating that although the United States must allow United Nations invitees access to the Headquarters District, invitees are not immune from legal process while in the United States at locations outside of the Headquarters District. See In re Galvao, [1963] U.N.Jur.Y.B. 164 (opinion of U.N. legal counsel); see also Restatement (Third) Sec. 469 reporter's note 8 (U.N. invitee "is not immune from suit or legal process outside the headquarters district during his sojourn in the United States").
 
 B. Federal common law immunity
 
 78
 Karadzic nonetheless invites us to fashion a federal common law immunity for those within a judicial district as a United Nations invitee. He contends that such a rule is necessary to prevent private litigants from inhibiting the United Nations in its ability to consult with invited visitors. Karadzic analogizes his proposed rule to the "government contacts exception" to the District of Columbia's long-arm statute, which has been broadly characterized to mean that "mere entry [into the District of Columbia] by non-residents for the purpose of contacting federal government agencies cannot serve as a basis for in personam jurisdiction," Rose v. Silver, 394 A.2d 1368, 1370 (D.C.1978); see also Naartex Consulting Corp. v. Watt, 722 F.2d 779, 785-87 (D.C.Cir.1983) (construing government contacts exception to District of Columbia's long-arm statute), cert. denied, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). He also points to a similar restriction upon assertion of personal jurisdiction on the basis of the presence of an individual who has entered a jurisdiction in order to attend court or otherwise engage in litigation. See generally 4 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Sec. 1076 (2d ed. 1987).
 
 
 79
 Karadzic also endeavors to find support for a common law immunity in our decision in Klinghoffer. Though, as noted above, Klinghoffer declined to extend the immunities of the Headquarters Agreement beyond those provided by its express provisions, the decision applied immunity considerations to its construction of New York's long-arm statute, N.Y.Civ.Prac.L. & R. 301 (McKinney 1990), in deciding whether the Palestine Liberation Organization (PLO) was doing business in the state. Klinghoffer construed the concept of "doing business" to cover only those activities of the PLO that were not United Nations-related. See 937 F.2d at 51.
 
 
 80
 Despite the considerations that guided Klinghoffer in its narrowing construction of the general terminology of New York's long-arm statute as applied to United Nations activities, we decline the invitation to create a federal common law immunity as an extension of the precise terms of a carefully crafted treaty that struck the balance between the interests of the United Nations and those of the United States.
 
 
 81
 Finally, we note that the mere possibility that Karadzic might at some future date be recognized by the United States as the head of state of a friendly nation and might thereby acquire head-of-state immunity does not transform the appellants' claims into a nonjusticiable request for an advisory opinion, as the District Court intimated. Even if such future recognition, determined by the Executive Branch, see Lafontant, 844 F.Supp. at 133, would create head-of-state immunity, but see In re Doe, 860 F.2d 40, 45 (2d Cir.1988) (passage of Foreign Sovereign Immunities Act leaves scope of head-of-state immunity uncertain), it would be entirely inappropriate for a court to create the functional equivalent of such an immunity based on speculation about what the Executive Branch might do in the future. See Mexico v. Hoffman, 324 U.S. 30, 35, 65 S.Ct. 530, 532, 89 L.Ed. 729 (1945) ("[I]t is the duty of the courts, in a matter so intimately associated with our foreign policy ..., not to enlarge an immunity to an extent which the government ... has not seen fit to recognize.").
 
 
 82
 In sum, if appellants personally served Karadzic with the summons and complaint while he was in New York but outside of the U.N. headquarters district, as they are prepared to prove, he is subject to the personal jurisdiction of the District Court.
 
 III. Justiciability
 
 83
 We recognize that cases of this nature might pose special questions concerning the judiciary's proper role when adjudication might have implications in the conduct of this nation's foreign relations. We do not read Filartiga to mean that the federal judiciary must always act in ways that risk significant interference with United States foreign relations. To the contrary, we recognize that suits of this nature can present difficulties that implicate sensitive matters of diplomacy historically reserved to the jurisdiction of the political branches. See First National Bank v. Banco Nacional de Cuba, 406 U.S. 759, 767, 92 S.Ct. 1808, 1813, 32 L.Ed.2d 466 (1972). We therefore proceed to consider whether, even though the jurisdictional threshold is satisfied in the pending cases, other considerations relevant to justiciability weigh against permitting the suits to proceed.
 
 
 84
 Two nonjurisdictional, prudential doctrines reflect the judiciary's concerns regarding separation of powers: the political question doctrine and the act of state doctrine. It is the " 'constitutional' underpinnings" of these doctrines that influenced the concurring opinions of Judge Robb and Judge Bork in Tel-Oren. Although we too recognize the potentially detrimental effects of judicial action in cases of this nature, we do not embrace the rather categorical views as to the inappropriateness of judicial action urged by Judges Robb and Bork. Not every case "touching foreign relations" is nonjusticiable, see Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962); Lamont v. Woods, 948 F.2d 825, 831-32 (2d Cir.1991), and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights. We believe a preferable approach is to weigh carefully the relevant considerations on a case-by-case basis. This will permit the judiciary to act where appropriate in light of the express legislative mandate of the Congress in section 1350, without compromising the primacy of the political branches in foreign affairs.
 
 
 85
 Karadzic maintains that these suits were properly dismissed because they present nonjusticiable political questions. We disagree. Although these cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions. "[T]he doctrine 'is one of "political questions," not one of "political cases." ' " Klinghoffer, 937 F.2d at 49 (quoting Baker, 369 U.S. at 217, 82 S.Ct. at 710).
 
 
 86
 A nonjusticiable political question would ordinarily involve one or more of the following factors:
 
 
 87
 a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 
 
 88
 Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710; see also Can v. United States, 14 F.3d 160, 163 (2d Cir.1994). With respect to the first three factors, we have noted in a similar context involving a tort suit against the PLO that "[t]he department to whom this issue has been 'constitutionally committed' is none other than our own--the Judiciary." Klinghoffer, 937 F.2d at 49. Although the present actions are not based on the common law of torts, as was Klinghoffer, our decision in Filartiga established that universally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort Act, which obviates any need to make initial policy decisions of the kind normally reserved for nonjudicial discretion. Moreover, the existence of judicially discoverable and manageable standards further undermines the claim that such suits relate to matters that are constitutionally committed to another branch. See Nixon v. United States, 506 U.S. 224, 227-29, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993).
 
 
 89
 The fourth through sixth Baker factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests. Disputes implicating foreign policy concerns have the potential to raise political question issues, although, as the Supreme Court has wisely cautioned, "it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.' " Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 229-30, 106 S.Ct. 2860, 2865-66, 92 L.Ed.2d 166 (1986) (quoting Baker, 369 U.S. at 211, 82 S.Ct. at 706-07).
 
 
 90
 The act of state doctrine, under which courts generally refrain from judging the acts of a foreign state within its territory, see Banco Nacional de Cuba v. Sabbatino, 376 U.S. at 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804; Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), might be implicated in some cases arising under section 1350. However, as in Filartiga, 630 F.2d at 889, we doubt that the acts of even a state official, taken in violation of a nation's fundamental law and wholly unratified by that nation's government, could properly be characterized as an act of state.
 
 
 91
 In the pending appeal, we need have no concern that interference with important governmental interests warrants rejection of appellants' claims. After commencing their action against Karadzic, attorneys for the plaintiffs in Doe wrote to the Secretary of State to oppose reported attempts by Karadzic to be granted immunity from suit in the United States; a copy of plaintiffs' complaint was attached to the letter. Far from intervening in the case to urge rejection of the suit on the ground that it presented political questions, the Department responded with a letter indicating that Karadzic was not immune from suit as an invitee of the United Nations. See Habib Letter, supra.[10] After oral argument in the pending appeals, this Court wrote to the Attorney General to inquire whether the United States wished to offer any further views concerning any of the issues raised. In a "Statement of Interest," signed by the Solicitor General and the State Department's Legal Adviser, the United States has expressly disclaimed any concern that the political question doctrine should be invoked to prevent the litigation of these lawsuits: "Although there might be instances in which federal courts are asked to issue rulings under the Alien Tort Statute or the Torture Victim Protection Act that might raise a political question, this is not one of them." Statement of Interest of the United States at 3. Though even an assertion of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication, the Government's reply to our inquiry reinforces our view that adjudication may properly proceed.
 
 
 92
 As to the act of state doctrine, the doctrine was not asserted in the District Court and is not before us on this appeal. See Filartiga, 630 F.2d at 889. Moreover, the appellee has not had the temerity to assert in this Court that the acts he allegedly committed are the officially approved policy of a state. Finally, as noted, we think it would be a rare case in which the act of state doctrine precluded suit under section 1350. Banco Nacional was careful to recognize the doctrine "in the absence of ... unambiguous agreement regarding controlling legal principles," 376 U.S. at 428, 84 S.Ct. at 940, such as exist in the pending litigation, and applied the doctrine only in a context--expropriation of an alien's property--in which world opinion was sharply divided, see id. at 428-30, 84 S.Ct. at 940-41.
 
 
 93
 Finally, we note that at this stage of the litigation no party has identified a more suitable forum, and we are aware of none. Though the Statement of the United States suggests the general importance of considering the doctrine of forum non conveniens, it seems evident that the courts of the former Yugoslavia, either in Serbia or war-torn Bosnia, are not now available to entertain plaintiffs' claims, even if circumstances concerning the location of witnesses and documents were presented that were sufficient to overcome the plaintiffs' preference for a United States forum.
 
 Conclusion
 
 94
 The judgment of the District Court dismissing appellants' complaints for lack of subject-matter jurisdiction is reversed, and the cases are remanded for further proceedings in accordance with this opinion.
 
 
 
 [1]
 Filartiga did not consider the alternative prong of the Alien Tort Act: suits by aliens for a tort committed in violation of "a treaty of the United States." See 630 F.2d at 880. As in Filartiga, plaintiffs in the instant cases "primarily rely upon treaties and other international instruments as evidence of an emerging norm of customary international law, rather th[a]n independent sources of law," id. at 880 n. 7
 
 
 [2]
 Two passages of the District Court's opinion arguably indicate that Judge Leisure found the pleading of a violation of the law of nations inadequate because Srpska, even if a state, is not a state "recognized" by other nations. "The current Bosnian-Serb warring military faction does not constitute a recognized state...." Doe, 866 F.Supp. at 741; "[t]he Bosnian-Serbs have achieved neither the level of organization nor the recognition that was attained by the PLO [in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984) ]," id. However, the opinion, read as a whole, makes clear that the Judge believed that Srpska is not a state and was not relying on lack of recognition by other states. See, e.g., id. at 741 n. 12 ("The Second Circuit has limited the definition of 'state' to 'entities that have a defined [territory] and a permanent population, that are under the control of their own government, and that engage in or have the capacity to engage in, formal relations with other entities.' Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 47 (2d Cir.1991) (quotation, brackets and citation omitted). The current Bosnian-Serb entity fails to meet this definition."). We quote Judge Leisure's quotation from Klinghoffer with the word "territory," which was inadvertently omitted
 
 
 [3]
 Section 702 provides:
 A state violates international law if, as a matter of state policy, it practices, encourages, or condones
 (a) genocide,
 (b) slavery or slave trade,
 (c) the murder or causing the disappearance of individuals,
 (d) torture or other cruel, inhuman, or degrading treatment or punishment,
 (e) prolonged arbitrary detention,
 (f) systematic racial discrimination, or
 (g) a consistent pattern of gross violations of internationally recognized human rights.
 
 
 [4]
 Section 404 provides:
 A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where [no other basis of jurisdiction] is present.
 
 
 [5]
 Judge Edwards was the only member of the Tel-Oren panel to confront the issue whether the law of nations applies to non-state actors. Then-Judge Bork, relying on separation of powers principles, concluded, in disagreement with Filartiga, that the Alien Tort Act did not apply to most violations of the law of nations. Tel-Oren, 726 F.2d at 798. Judge Robb concluded that the controversy was nonjusticiable. Id. at 823
 
 
 [6]
 The Senate Report merely repeats the language of section 1092 and does not provide any explanation of its purpose. See S. Rep. 333, 100th Cong., 2d Sess., at 5 (1988), reprinted at 1988 U.S.C.C.A.N. 4156, 4160. The House Report explains that section 1092 "clarifies that the bill creates no new federal cause of action in civil proceedings." H.R. Rep. 566, 100th Cong., 2d Sess., at 8 (1988) (emphasis added). This explanation confirms our view that the Genocide Convention Implementation Act was not intended to abrogate civil causes of action that might be available under existing laws, such as the Alien Tort Act
 
 
 [7]
 Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3114, T.I.A.S. 3362, 75 U.N.T.S. 31 (hereinafter "Geneva Convention I"); Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of Armed Forces at Sea, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3217, T.I.A.S. 3363, 75 U.N.T.S. 85; Convention Relative to the Treatment of Prisoners of War, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135; Convention Relative to the Protection of Civilian Persons in Time of War, entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3516, T.I.A.S. 3365, 75 U.N.T.S. 287
 
 
 [8]
 Appellants also maintain that the forces under Karadzic's command are bound by the Protocol Additional to the Geneva Conventions of 12 August 1949, Relating to the Protection of Victims of Non-International Armed Conflicts, 16 I.L.M. 1442 (1977) ("Protocol II"), which has been signed but not ratified by the United States, see International Committee of the Red Cross: Status of Four Geneva Conventions and Additional Protocols I and II, 30 I.L.M. 397 (1991). Protocol II supplements the fundamental requirements of common article 3 for armed conflicts that "take place in the territory of a High Contracting Party between its armed forces and dissident armed forces or other organized armed groups which, under responsible command, exercise such control over a part of its territory as to enable them to carry out sustained and concerted military operations and to implement this Protocol." Id. art. 1. In addition, plaintiffs argue that the forces under Karadzic's command are bound by the remaining provisions of the Geneva Conventions, which govern international conflicts, see Geneva Convention I art. 2, because the self-proclaimed Bosnian-Serb republic is a nation that is at war with Bosnia-Herzegovina or, alternatively, the Bosnian-Serbs are an insurgent group in a civil war who have attained the status of "belligerents," and to whom the rules governing international wars therefore apply
 At this stage in the proceedings, however, it is unnecessary for us to decide whether the requirements of Protocol II have ripened into universally accepted norms of international law, or whether the provisions of the Geneva Conventions applicable to international conflicts apply to the Bosnian-Serb forces on either theory advanced by plaintiffs.
 
 
 [9]
 Conceivably, a narrow immunity from service of process might exist under section 11 for invitees who are in direct transit between an airport (or other point of entry into the United States) and the Headquarters District. Even if such a narrow immunity did exist--which we do not decide--Karadzic would not benefit from it since he was not served while traveling to or from the Headquarters District
 
 
 [10]
 The Habib Letter on behalf of the State Department added:
 We share your repulsion at the sexual assaults and other war crimes that have been reported as part of the policy of ethnic cleansing in Bosnia-Herzegovina. The United States has reported rape and other grave breaches of the Geneva Conventions to the United Nations. This information is being investigated by a United Nations Commission of Experts, which was established at U.S. initiative.