KATZMANN, Circuit Judge,
concurring:
This case calls upon us in principal part to determine whether the district court erred in concluding that it does not have jurisdiction over the plaintiffs’ claims brought under the Alien Torts Claim Act (“ATCA”), 28 U.S.C. § 1350. I respectfully believe that the district court erred in its analysis of plaintiffs’ ATCA claims in two fundamental respects. First, it conflated the jurisdictional and cause of action analyses required by the ATCA. As a result, the district court mistakenly incorporated a discretionary analysis into the determination of whether it has jurisdiction under the ATCA. Second, it erroneously held that aiding and abetting liability does not exist under international law.
I
The ATCA provides that “[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” Id. When we last substantively grappled with the meaning of this statute, we noted that “neither Congress nor the Supreme Court ha[d] definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA.” Flores v. S. Peru Copper Corp., 414 F.3d 233, 247 (2d Cir.2003). The next year the Supreme Court weighed in on the modern resurgence of the statute in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). While the Court did not definitively resolve all of the complex and controversial questions the ATCA raises, it did clarify to a significant degree how claims brought under the ATCA should be analyzed.
Sosa endorsed our Court’s prior approach to the ATCA to the extent that we recognized that the Act created jurisdiction for a narrow set of violations of international law, see id. at 720, 124 S.Ct. 2739 (“Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations.”); see also Filartiga v. Pena-Irala, 630 F.2d 876, 887-88 (2d Cir.1980) (construing the ATCA “as opening the federal courts for adjudication of ... well-established, universally recognized norms of international law”), and that a plaintiffs claim “must be gauged against the current state of international law,” Sosa, 542 U.S. at 733, 124 S.Ct. 2739; see also Filartiga, 630 F.2d at 881 (“[I]t is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today.”). The Court also generally endorsed the cautious approach that we had long applied in determining whether to hear cases brought under the ATCA. See, e.g., Sosa, 542 U.S. at 728-29, 124 S.Ct. 2739 (noting that “great caution” must be exercised in deciding which “norms of today’s *265 law of nations may ... be recognized legitimately by federal courts”); see also Flores, 414 F.3d at 248 (“[I]n determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint.”).
Sosa did, however, deviate from our case law in one crucial respect. We had allowed cases to proceed under the ATCA on the assumption that when plaintiffs alleged violations of well-established international law, their “causes of action are statutorily authorized.” Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir.1995); see also Flores, 414 F.3d at 245 (discussing the reception of “Filartiga’s holding that the ATCA creates a private right of action for violations of United States treaties or customary international law”). The Supreme Court flatly rejected this notion. See Sosa, 542 U.S. at 713-14, 124 S.Ct. 2739 (citing William R. Casto, The Federal Courts’ Protective Jurisdiction Over Torts Committed in Violation of the Law Of Nations, 18 Conn. L.Rev. 467, 479, 480 (1986)). Sosa construed the statute instead to be of a “strictly jurisdictional nature,” in the sense that it “address[ed] the power of the courts to entertain cases concerned with a certain subject.” 542 U.S. at 713, 714, 124 S.Ct. 2739.
This holding led the Court to explore “a new question, this one about the interaction between the [ATCA] at the time of its enactment and the ambient law of the era.” Id. at 714, 124 S.Ct. 2739. The Court rejected the argument that the First Congress passed the ATCA “as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, some day, authorize the creation of causes of action.” Id. at 719, 124 S.Ct. 2739. Rather, the historical materials suggested that “the statute was intended to have practical effect the moment it became law.” Id. at 724, 124 S.Ct. 2739. This practical effect would be achieved through the invocation of causes of action already available at common law. Because some “torts in violation of the law of nations were understood to be within the common law” of 1789, the First Congress would have “understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations.” Id. at 720, 724, 124 S.Ct. 2739. No further substantive legislation was required. Id. at 724, 124 S.Ct. 2739 (“The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.”).
Finding that “no development in the two centuries from the enactment of § 1350 to [today] has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law,” id. at 724-25, 124 S.Ct. 2739, the Court held that federal courts retained the ability to “adapt[] the law of nations to private rights” by recognizing “further international norms as judicially enforceable today,” id. at 728, 729, 124 S.Ct. 2739. Most importantly, these norms were enforceable not by virtue of this statutory creation or authorization of a private right of action, as we had previously assumed, but rather through an exercise in “residual common law discretion” to create causes of action under federal common law to remedy the violation of those norms. Id. at 738, 124 S.Ct. 2739; see also id. at 728-31, 124 S.Ct. 2739. Thus, Sosa makes clear that all ATCA litigation is in fact based on federal common law, rather than a statutory cause of action. But a federal court’s power to create these causes of action is not without limits. Indeed, the Court identified a number of “good reasons for a restrained conception of the discretion a federal court should exercise in consider *266 ing a new cause of action of this kind.”[1] Id. at 725, 728, 124 S.Ct. 2739. Its consideration of these factors led the Court to identify a minimum requirement “for accepting a cause of action subject to jurisdiction under § 1350,” namely, that “federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.” Id. at 732, 124 S.Ct. 2739.
Based on the Supreme Court’s holdings in Sosa that (1) the ATCA is purely jurisdictional and (2) the common law provides the cause of action for claims brought under that jurisdiction, a federal court faced with a suit alleging a tort in violation of international law must undertake two distinct analytical inquiries. One is whether jurisdiction lies under the ATCA. The other is whether to recognize a common-law cause of action to provide a remedy for the alleged violation of international law. Requiring this analytical separation in ATCA litigation comports with the general principle that whether jurisdiction exists and whether a cause of action exists are two distinct inquiries. See TCG N.Y., Inc. v. City of White Plains, 305 F.3d 67, 74 (2d Cir.2002) (noting the Supreme Court’s holding that “ ‘the question whether a federal statute creates a claim for relief is not jurisdietional’ ” (quoting Northwest Airlines, Inc. v. County of Kent, 510 U.S. 355, 365, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994)); cf. Rasul v. Bush, 542 U.S. 466, 484-85, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (reversing the D.C. Circuit’s holding that jurisdiction did not lie under the ATCA without engaging in a cause of action inquiry). Moreover, it reflects the fact that it is Congress, and not the courts, that possesses the power to define the scope of the courts’ jurisdiction. Cf. Whitmore v. Arkansas, 495 U.S. 149, 155-56, 161, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (noting that “[a] federal court is powerless to create its own jurisdiction” and that a court may not “employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case”). Thus, one might question the extent to which a federal court should exercise its own judgment about the practical consequences of allowing a suit to go forward in the context of its jurisdictional inquiry when, according to the plain language of the ATCA, that inquiry is resolved solely by reference to international law. Cf. Harrison v. PPG Indus., Inc., 446 U.S. 578, 593, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (noting that courts should look to Congress’s intent, and not policy considerations, when construing the terms of a jurisdictional statute).[2] By con *267 trast, it is entirely appropriate for courts to consider such concerns in the context of determining whether to recognize a cause of action under federal common law.
Having identified the two steps of the inquiry, I now elaborate on what each inquiry requires. Aside from noting that “Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations,” Sosa, 542 U.S. at 720, 124 S.Ct. 2739, the Supreme Court did not discuss the requirements for invoking this jurisdictional grant in a particular case. The ATCA, by its terms, “confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations.” Kadic, 70 F.3d at 238. In Flores, we held that the law of nations, or customary international law,[3] “is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.” 414 F.3d at 248; see also The Paquete Habana, 175 U.S. 677, 708, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (describing a rule of international law as one reached by “general consent of the civilized nations of the world” and “founded on considerations of ... the mutual convenience of belligerent states”). In determining whether a given offense meets these requirements, we look to the sources of law identified by the Statute of the International Court of Justice (“ICJ Statute”) as the proper sources of international law. See Flores, 414 F.3d at 250-51. These include:
a.international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
b. international custom, as evidence of a general practice accepted as law;
c. the general principles of law recognized by civilized nations;
[and]
d. ... judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.
ICJ Statute, art. 38, June 26, 1945, 59 Stat. 1055,1060.
If jurisdiction is established, the second inquiry is whether a common-law cause of action should be created to provide a remedy for the alleged violation of international law. Recognizing that “there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind,” the Court in Sosa “require[d] any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized,” namely, “violation of safe conducts, infringement of the rights of ambassadors, and piracy.” 542 U.S. at 724-25, 124 S.Ct. 2739; see also id. at 732, 124 S.Ct. 2739 (“[W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was en *268 acted.”). In setting out this standard, the Court cited with approval our decision in Filartiga, noting that “[t]his limit upon judicial recognition is generally consistent with the reasoning of many of the courts and judges who faced the issue before it reached this Court.” Id.
The Supreme Court instructed that determining whether to recognize a new cause of action “should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.” Id. at 732-33, 124 S.Ct. 2739. I do not read Sosa as requiring that a court individually analyze each of the five reasons it identifies as “argu[ing] for judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by the ... statute.” Sosa, 542 U.S. at 725, 124 S.Ct. 2739. These reasons are already captured by the “high bar to new private causes of action” set by the requirement that a claim be accepted by the civilized world and defined with a sufficient degree of specificity. See id. at 727-32, 124 S.Ct. 2739; see also id. at 725, 124 S.Ct. 2739 (noting that “there are good reasons for a restrained conception of [a federal court’s] discretion” and that “[accordingly ... courts should require any claim” to meet its standard of acceptance and specificity); David H. Moore, An Emerging Uniformity for International Law, 75 Geo. Wash. L.Rev. 1, 40-41 (2006) (“Those concerns, which arise whenever [customary international law] is incorporated as federal common law, are mitigated by the specific definition and mutuality requirements.”). I do, however, view the Court’s instruction that an element of judgment must be involved in the decision to recognize a cause of action as an invitation to lower courts to consider other prudential concerns consistent with Sosa’s approach. As Sosa suggests, courts considering the “practical consequences” of recognizing a new cause of action should assess the consequences that might result from making the cause of action generally available to all potential plaintiffs.
In sum, a district court analyzing a claim under the ATCA will normally be required to engage in a two-part analysis. The district court here erred by failing to undertake separately the two parts of this analysis. By conflating these two questions, the district court inappropriately injected a discretionary element into the determination of whether it had jurisdiction under the ATCA. See In re S. African Apartheid Litig., 346 F.Supp.2d at 551, 553-54. Of greater significance to the district court’s ultimate disposition of the plaintiffs’ claims, though, was its error in analyzing whether the plaintiffs had alleged a “violation of the law of nations,” as is required for plaintiffs to establish both jurisdiction and a cause of action. It is to this analysis that I now turn.
II
Asking whether “aiding and abetting international law violations ... [is a] violation ] of the law of nations that [is] ‘accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms,’ ” Id. at 549 (quoting Sosa, 542 U.S. at 725, 124 S.Ct. 2739), the district court concluded that it is not, noting that it found “little [in its review of international law] that would lead [it] to conclude that aiding and abetting international law violations is itself an international law violation that is universally accepted as a legal obligation,” id. Although I believe the district court was correct to look to international law, I disagree with its analysis.
A.
The district court’s conclusion that its jurisdiction under the ATCA should de *269 pend on whether international law specifically recognizes liability for aiding and abetting violations of the law of nations is consistent with our prior case law. We have repeatedly emphasized that the scope of the ATCA’s jurisdictional grant should be determined by reference to international law. See Kadic, 70 F.3d at 238 (requiring courts to engage in a “searching review” of international law to verify that subject matter jurisdiction lies for a particular action); see also Flores, 414 F.3d at 248 (noting that “courts must proceed with extraordinary care and restraint” in “determining what offenses violate customary international law”); Filartiga, 630 F.2d at 887 (“The paucity of suits successfully maintained under the section is readily attributable to the statute’s requirement of alleging a ‘violation of the law of nations’ [ ] at the jurisdictional threshold.”).
It is also consistent with the Supreme Court’s opinion in Sosa. The Court observed in a footnote that “whether a norm is sufficiently definite to support a cause of action” raises a “related consideration [of] whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual.” Sosa, 542 U.S. at 732 & n. 20, 124 S.Ct. 2739. While this footnote specifically concerns the liability of non-state actors, its general principle is equally applicable to the question of where to look to determine whether the scope of liability for a violation of international law should extend to aiders and abettors. Furthermore, in Sosa, the Supreme Court echoed our prior cases’ emphasis on the narrowness of the ATCA’s jurisdictional grant. See id. at 720, 124 S.Ct. 2739 (“Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations.”); see also id. at 712, 124 S.Ct. 2739 (describing the statute as a “limited, implicit sanction to entertain the handful of international law cum common law claims understood in 1789”). I believe that we most effectively maintain the appropriate scope of this jurisdiction by requiring that the specific conduct allegedly committed by the defendants sued represents a violation of international law.
Most importantly, the district court’s approach is consistent with Sosa’s broader characterization of the relationship between federal common law and international law. The ATCA’s jurisdictional grant “enable[s] federal courts to hear claims in a very limited category defined by the law of nations.” Id. at 712, 124 S.Ct. 2739 (emphasis added). Once a court determines that the defendants’ alleged conduct falls within one of “the modest number of international law violations with a potential for personal liability” on the defendants’ part, it then considers whether “the common law would provide a cause of action” to enable the plaintiffs to bring their claim. Id. at 724, 124 S.Ct. 2739. The common law thus permits the “independent judicial recognition of actionable international norms,” but the courts must, as Sosa cautioned, be “vigilant doorkeepers].” Id. at 729, 124 S.Ct. 2739. We recognized this important role for domestic law in Kadic when we explained that the “law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that are available for international law violations.”[4] 70 F.3d at 246. A federal court is free, in the exercise of its common-law discretion, to decline to provide a cause of action for a violation of international law. See Sosa, *270 542 U.S. at 732-33, 124 S.Ct. 2739; Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 778 (D.C.Cir.1984) (Edwards, J., concurring) (explaining that each state may choose whether to impose civil liability for violations of international law). But to assure itself that it has jurisdiction to hear a claim under the ATCA, it should first determine whether the alleged tort was in fact “committed in violation of the law of nations,” 28 U.S.C. § 1350, and whether this law would recognize the defendants’ responsibility for that violation.
B.
I conclude that the recognition of the individual responsibility of a defendant who aids and abets a violation of international law is one of those rules “that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern.” Flores, 414 F.3d at 248. Recognized as part of the customary law which authorized and was applied by the war crimes trials following the Second World War, it has been frequently invoked in international law instruments as an accepted mode of liability. During the second half of the twentieth century and into this century, it has been repeatedly recognized in numerous international treaties, most notably the Rome Statute of the International Criminal Court, and in the statutes creating the International Criminal Tribunal for the Former Yugoslavia (“ICTY”) and the International Criminal Tribunal for Rwanda (“ICTR”).[5] Indeed, the United States concedes, and the defendants do not dispute, that the concept of criminal aiding and abetting liability is “well established” in international law.[6] Brief for the United States as Amicus Curiae, at 21.
*271 The London Charter, which established the International Military Tribunal at Nuremberg, was entered into by the allied powers of World War II, “acting in the interests of all the United Nations,” to establish a tribunal to punish violations of international law. See Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, pmbh, Aug. 8, 1945, E.A.S. 472 (hereinafter London Charter). We have previously recognized the London Charter as an authoritative source of customary international law. See Flores, 414 F.3d at 244 n. 18; United States v. Yousef, 327 F.3d 56, 105 nn. 39-40 (2d Cir.2003) (citing the London Charter for definitions of war crimes and crimes against humanity under international law). Moreover, other courts, international bodies, and scholars have recognized that the principles set out in the London Charter and applied by the International Military Tribunal are significant not only because they have garnered broad acceptance, but also because they were viewed as reflecting and crystallizing preexisting customary international law. See Princz v. Federal Republic of Germany, 26 F.3d 1166, 1174 (D.C.Cir.1994) (“The trials for the first time made explicit and unambiguous what was theretofore, as the Tribunal has declared, implicit in International Law .... ” (citation, alteration, and internal quotation marks omitted)); Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 715 (9th Cir.1992) (“The legitimacy of the Nuremberg prosecutions rested ... on the nature of the acts [the defendants] committed: acts that the laws of all civilized nations define as criminal. The universal and fundamental rights of human beings identified by Nuremberg ... are the direct ancestors of the universal and fundamental norms recognized as jus cogens.” (citations omitted)); Theodor Meron, Reflections on the Prosecution of War Crimes by International Tribunals, 100 Am. J. Int’l L. 551, 559 (2006) (“[T]he Nuremberg and Tokyo Tribunals drew heavily on the 1929 Geneva Prisoner of War Convention and the Fourth Hague Convention of 1907 as establishing the substantive law to be applied — that is, as customary law and general principles of criminal law, and as norms of both state responsibility and individual criminal liability.” (footnotes omitted)). Indeed, shortly after the conclusion of the initial war crimes trials, the General Assembly of the United Nations unanimously approved a resolution affirming “the principles of international law recognized by the Charter of the Nürnberg Tribunal and the judgment of the Tribunal.” Affirmation of the Principles of International Law Recognized in the Charter of the Nürnberg Tribunal, G.A. Res. 95(1), at 188, U.N. Doc. A/236 (Dec. 11, 1946) (hereinafter Nuremberg Principles Resolution I).
*272 The London Charter extended individual responsibility for crimes within its jurisdiction not only to “[Headers, organizers, [and] instigators” but also to “accomplices participating in the formulation or execution of a common plan or conspiracy to commit” any of the crimes triable by the Tribunal. London Charter art. 6. While the Charter’s language tak$n “literally ... would seem to imply that the complicity rule did not apply to crimes perpetrated by individual action,” as opposed to by common plan, in practice the Tribunal “applied general principles of criminal law regarding complicity.” International Law Commission, Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, with commentaries, G.A.O.R., 5th session, Supp. No. 12, U.N. Doc. A/1316, ¶¶ 126-27 (1950) (“ILC Principles”). Accordingly, when the International Law Commission (“ILC”) formulated the “principles recognized in the Charter ... and in the judgment of the Tribunal” at the direction of the General Assembly, see Nuremberg Principles Resolution I, it omitted any indication of a limitation on accomplice liability. Principle VII provides that “[complicity in the commission of a crime against peace, a war crime, or a crime against humanity ... is a crime under international law.” ILC Principles, Principle VII. The ILC’s formulation of the principles is considered to be an authoritative rendering of the formal holdings of the Nuremberg Tribunal and is consulted as an authoritative source of customary international law by the ICTY and ICTR. See, e.g., Prosecutor v. Akayesu, Case No. ICTR-96-4-T, Trial Chamber Judgment, ¶ 526 (Sept. 2, 1998) (citing Principle VII to establish that “participation by complicity in the most serious violations of international humanitarian law was considered a crime as early as Nuremberg”); see also Prosecutor v. Milosevic, Case No. IT-02-54, Trial Chamber Decision on Preliminary Motions, ¶¶ 29-30 (Nov. 8, 2001) (finding that “[t]he customary character of [a] rule [of individual responsibility] is further supported by its incorporation in a wide number of other instruments,” including, inter alia^ the ILC Principles).
That the London Charter’s use of the term “accomplice” was understood to include those who aid and abet a crime is further confirmed by the law applied in the war crimes trials held in the United States zone of occupation following World War II. War criminals in the United States zone of occupation were tried under Control Council Law No. 10, an act promulgated by the joint allied body that coordinated the governance of post-war Germany. Allied Control Council Law No. 10 (Dec. 20,1945) in Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10, at XVIII (William S. Hein & Co., Inc. 1997) (1949). Control Council Law No. 10 was patterned after the London Charter and enacted under its authority with the declared purpose to “give [it] effect.” Flick v. Johnson, 174 F.2d 983, 985-86 (D.C.Cir.1949). According to Telford Taylor, the Chief of Counsel for War Crimes and the Chief Prosecutor for the United States under the London Charter, the “underlying principles” of the London Charter and Law No. 10 “are identical” and the tribunals operating under each “worked within the same framework” with respect to “the basic principles of international penal law.” Telford Taylor, Final Report to the Secretary of the Army on the Nuernberg War Crimes Trial Under Control Council Law No. 10, at 107 (1949), available at http://www. loc.gov/rr/frd/Military_Law/NT_final-re-porthtml. Control Council Law No. 10 imposed criminal liability on anyone who was “an accessory to the commission of any *273 such crime or ordered or abetted the same,” Control Council Law No. 10, art. II, sec. 2 (emphasis added), and tribunals applying Control Council Law No. 10 are viewed by international bodies as having recognized aiding and abetting liability. See Prosecutor v. Furundzija, Case No. IT-95-17/1, Trial Chamber Judgment, ¶¶ 195-225, 236-40 (Dec. 10, 1998) (reviewing the case law).
We have previously acknowledged the contribution that Control Council Law No. 10 and the tribunals that applied it have made to customary international law. In Flores, to support our conclusion that “[c]ustomary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II,” 414 F.3d at 244 n. 18, we pointed specifically to Brigadier General Taylor’s assessment that “the major legal significance of the Law No. 10 judgments lies ... in those portions of the judgments dealing with the area of personal responsibility for international law crimes,” Taylor, supra, at 109, quoted in Flores, 414 F.3d at 244 n. 18. The United States Government, as amicus in this case, similarly acknowledges the role this law has played in establishing the availability of aiding and abetting liability in modern international criminal tribunals. Brief for the United States as Amicus Curiae, at 21 n. 11.
Having been accepted as one of the core principles of the post-World War II war crimes trials, the individual criminal responsibility of those who aid and abet violations of international law was repeatedly reflected in international treaties thereafter. These treaties include major agreements addressing fundamental human rights concerns such as torture, apartheid, slavery, and genocide. See United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 4, Dec. 10, 1984, 1465 U.N.T.S. 85; International Convention on the Suppression and Punishment of the Crime of Apartheid, art. 111(b), Nov. 30, 1973, 1015 U.N.T.S. 243; Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, art. 6, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3; Convention on the Prevention and Punishment of the Crime of Genocide, art 111(e), Dec. 9, 1948, 78 U.N.T.S. 277, 280 (hereinafter Genocide Convention). Aiding and abetting liability has also been recognized in treaties addressed to crimes of general international concern such as bribery of foreign officials in international business transactions and drug trafficking.[7] See Convention on Combating Bribery of For *274 eign Public Officials in International Business Transactions, art. 1(2), Dec. 17, 1997, reprinted in 37 I.L.M. 1 (1998); United Nations Convention on Psychotropic Substances, art. 22(2)(a)(ii), Feb. 21, 1971, 32 U.S.T. 543, 1019 U.N.T.S. 175. More recently, aiding and abetting has been included in a number of the treaties concerning organized crime and terrorism, which have become prominent concerns of the international community. See United Nations Convention Against Transnational Organized Crime, art. 5(l)(b), G.A. Res. 55/25, at 5-6, U.N. Doc. A/RES/55/25 (Jan. 8, 2001); International Convention for the Suppression of the Financing of Terrorism, art. 2(5)(a), opened for signature Jan. 10, 2000, 39 I.L.M. 270; International Convention for the Suppression of Terrorist Bombings, art. 2(3)(a), May 23, 2001, 2149 U.N.T.S. 256; see also Protocol Against the Smuggling of Migrants by Land, Sea and Air, Supplementing the United Nations Convention Against Transnational Organized Crime, art.5 (l)(b), G.A. Res. 55/25, at 40, U.N. Doc. A/RES/55/25 (Jan. 8, 2001). The United Nations Security Council (“Security Council”) also appears to have recognized the importance of accomplice liability in the international response to terrorism, directing states in the wake of the September 11 attacks to “[e]n-sure that any person who participates in the financing, planning, preparation or perpetration of terrorists acts or in supporting terrorists acts is brought to justice.” S.C. Res. 1373, ¶2(6), U.N. Doc. S/RES/1373 (Sept. 28, 2001) (emphasis added).
Aiding and abetting liability continues to be recognized and enforced in international tribunals. The Statutes creating the ICTY and ICTR were adopted by resolutions of the Security Council. In their respective sections on individual criminal responsibility, both statutes impose individual liability on any person “who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution” of a crime. Statute of the International Tribunal for the Former Yugoslavia, art. 7, S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993) (hereinafter ICTY Statute); Statute of the International Criminal Tribunal for Rwanda, art. 6, S.C. Res. 955, U.N. Doc. S/RES/ 955 (Nov. 8, 1994) (hereinafter ICTR Statute).
As with the London Charter, the recognition of aiding and abetting liability in the ICTY Statute is particularly significant because the “Individual Criminal Responsibility” section of that statute was intended to codify existing norms of customary international law. In his report to the Security Council regarding the creation of the ICTY, the Secretary-General explained that “in assigning to the International Tribunal the task of prosecuting persons responsible for serious violations of international humanitarian law, the Security Council would not be creating or purporting to ‘legislate’ that law. Rather, the International Tribunal would have the task of applying existing international humanitarian law.” Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808, ¶ 29, U.N. Doc. S/25704 (May 3, 1993) (“Sec’y-General Report”). Indeed, international law principles “require[d]” that the Tribunal’s jurisdiction be limited to “rules of international humanitarian law which are beyond any doubt part of customary [international] law.” Id. ¶ 34. Accordingly, the provision of aiding and abetting liability in the ICTY statute reflects a determination by both the Secretary-General and the Security Council, which approved the Secretary-General’s report when it enacted the statute, that such liability is firmly established in customary international law. The inclusion of substantively identical language in *275 the statute creating the ICTR presumably reflects a similar determination.[8]
Consistent with its statutory authorization, the ICTY has recognized and applied aiding and abetting liability for violations of international law. See, e.g., Funmdzija, Trial Chamber Judgment, ¶¶ 249, 275; Prosecutor v. Tadic, Case No. IT-94-1-T, Trial Chamber Opinion and Judgment, ¶¶ 689-92, 730, 735, 738 (May 7, 1997). Furthermore, it has done so only after confirming that such liability was part of customary law. As the Tribunal recognized, it was required to determine “the objective basis for such individual responsibility as a matter of customary international law ... since the International Tribunal is only empowered to apply international humanitarian law that is ‘beyond any doubt customary law.’ ” Tadic, Trial Chamber Opinion and Judgment, ¶ 662 (quoting Sec’y General Report ¶ 34). The Tribunal therefore conducted a probing and thoughtful analysis of international law sources in its early decisions to confirm that aiding and abetting liability is recognized in customary international law. See Furundzija, Trial Chamber Judgment, ¶¶ 190-249; Tadic, Trial Chamber Opinion and Judgment, ¶¶ 661-91.
More recently, the Rome Statute of the International Criminal Court (“Rome Statute”), July 17, 1998, 2187 U.N.T.S. 90, provides that a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the ICC if that person:
(c) For the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission; [or]
(d) In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:
(i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or
(ii) Be made in the knowledge of the intention of the group to commit the crime[.]
Id. art. 25(3)(c), (d). The Rome Statute is particularly significant for the present inquiry because, unlike other sources of international legislation, it articulates the mens rea required for aiding and abetting liability. The Statute makes clear that, other than assistance rendered to the commission of a crime by a group of persons acting with a common purpose, a defendant is guilty of aiding and abetting the commission of a crime only if he does so “[f]or the purpose of facilitating the commission of such a crime.” Id. art. 25(3)(c).
In drawing upon the Rome Statute, I recognize that it has yet to be construed by the International Criminal Court; its *276 precise contours and the extent to which it may differ from customary international law thus remain, somewhat uncertain. Nevertheless, the Statute has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world.[9] It may therefore be taken “by and large ... as constituting an authoritative expression of the legal views of a great number of States.” Furundzija, Trial Chamber Judgment, ¶ 227.
Furthermore, the Rome Statute’s mens rea standard is entirely consistent with the application of accomplice liability under the sources of international law discussed above.[10] For example, in the Ministries Case conducted under Control Council Law No. 10, the tribunal declined to impose criminal liability on a bank officer who was alleged to have “made a loan, knowing or having good reason to believe that the borrower w[ould] use the funds in financing enterprises [conducted] in violation of either national or international law,” but was not proven to have made the loan with the purpose of facilitating the enterprises’ illegal activities.[11] United States v. von Weizsaecker (The Ministries Case), in 14 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 308, 622 (William S. Hein & Co., Inc. 1997) (1949). Meanwhile, those who assist in the commission of a crime with the purpose of facilitating that crime would be subject to aiding and abetting liability under the statutes governing the ICTY and ICTR.[12] My *277 research has revealed no source of international law that recognizes liability for aiding and abetting a violation of international law but would not authorize the imposition of such liability on a party who acts with the purpose of facilitating that violation (provided, of course, that the actus reus requirement is also satisfied).
With respect to the actus retís component of the aiding and abetting liability, the international legislation is less helpful in identifying a specific standard. However, in the course of its analysis of customary international law, the ICTY concluded that “the actus reus of aiding and abetting in international criminal law requires practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime.” Furundzija, Trial Chamber Judgment, ¶ 235 (second emphasis added). My research has uncovered nothing to indicate that a standard other than “substantial assistance” should apply.
Accordingly, I conclude that a defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime. Furthermore, based on this review of international law’s treatment of aiding and abetting liability over the past sixty years, I conclude that aiding and abetting liability, so defined, is sufficiently “well-established[ ][and] universally recognized” to be considered customary international law for the purposes of the ATCA. See Kadic, 70 F.3d at 239 (internal quotation marks omitted). This conclusion comports with the decisions of several other federal courts that have considered the issue.[13] See Almog v. Arab Bank, PLC, 471 F.Supp.2d 257, 287 (E.D.N.Y.2007) (noting the “vast body of law finding aiding and abetting liability available under the [ATCA]”); Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F.Supp.2d 633, 668 (S.D.N.Y.2006) (“Aiding and abetting liability is a specifically defined norm of international character that is properly applied as the law of nations for purposes of the [ATCA].”); Bowoto v. Chevron Corp., No. C 99-02506 SI, 2006 WL 2455752, *3-4 (N.D.Cal. Aug.22, 2006); In re “Agent Orange” Prod. Liab. Litig., 373 F.Supp.2d 7, 52-54 (E.D.N.Y.2005).
C.
While I conclude that, at present, only aiding and abetting liability imposed in accordance with the standard outlined above is sufficiently well-established and universally recognized under international law to trigger jurisdiction under the ATCA, I appreciate that this definition is not necessarily set in stone. International law, like our domestic law, can change, and the ATCA was intended to change along with it. See Sosa, 542 U.S. at 728, 124 S.Ct. 2739 (noting Congress’s intention in *278 passing the TVPA that the ATCA “ ‘remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law’ ” (quoting H.R.Rep. No. 102-367, pt. 1, p. 3 (1991)); see also id. at 725, 124 S.Ct. 2739 (articulating the standard for courts hearing “any claim based on the present-day law of nations” (emphasis added)). In this regard, I note that there is some support, principally in tribunal decisions from the ICTY and ICTR, for a definition of aiding and abetting that would lead to liability where an individual provides substantial assistance with “the knowledge that the acts performed by the aider and abettor assist the commission of the specific crime of the principal.”[14] Prosecutor v. Vasiljevic, Case No. IT-98-32-A, Appeals Chamber Judgment, ¶¶ 102(i)-(ii) (Feb. 25, 2004); see also Fu-rundzija, Trial Chamber Judgment, ¶¶ 249, 275; Tadic, Trial Chamber Opinion and Judgment, ¶¶ 689-92, 730, 735, 738.
To be sure, I acknowledge limitations on the extent to which we may rely on the decisions of the ICTY and ICTR for the present purposes.[15] Those decisions arise out of completely distinct factual contexts and often involve defendants who might have been convicted on alternate theories of liability. Moreover, as a scholar and participant in the ICTY noted, panels of that Tribunal occasionally (and consciously) engaged in discussions “peripheral to the ratio decidendi of a case” in order to provide “clarification [that] might have some value for the future development of international criminal law.” Antonio Cass-ese, The ICTY: A Living and Vital Reality, 2 J. Int’l Crim. Just. 585, 589-90 (2004). Such clarification through dicta can be useful and is not necessarily without justification. See id. at 590 (“[T]he absence of an international law-maker and an international court with compulsory universal jurisdiction entails that many rules are not clear, particularly when they are of customary origin, and are thus open to differing interpretations — hence the need for courts gradually to spell out the contents of those rules, if need be through obiter dicta.”); see also 1 Oppenheim’s International Law: Peace 41 (Robert Jennings & Arthur Watts eds., 9th ed.1992) (noting that “in view of the difficulties surrounding the codification of international law,” international tribunals are expected to “fulfil, inconspicuously but efficiently, a large part of the task of developing international law”). But it “may also prove simply academic and sometimes also misleading for future courts pronouncing on the same matters.” Cassese, supra, at 590.
Nevertheless, the opinions of the ICTY and ICTR provide evidence of the state of customary international law. As a leading treatise explains, “decisions of international tribunals ... exercise considerable influence as an impartial and considered statement of the law by jurists of authority in *279 light of actual problems which arise before them.” 1 Oppenheim’s, supra, at 41; see also Ian Brownlie, Principles of Public International Law at 19 (noting that “the practical significance of the label ‘subsidiary means’ in Article 38(l)(d) is not to be exaggerated”). The ICTY has been specifically recognized as having provided “a number of significant findings on issues of law.” Brownlie, supra, at 23; see also Cassese, supra, at 591-93 (arguing that the ICTY “clarified the contours of many notions of international criminal law,” including “the notion of aiding and abetting”); cf. Sosa, 542 U.S. at 734, 124 S.Ct. 2739 (“ ‘[W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat.’ ” (quoting The Paquete Habana, 175 U.S. at 700, 20 S.Ct. 290) (alteration in original)). While I am unable to find that liability predicated on the definition of aiding and abetting offered in the decisions of the ICTY and ICTR is sufficiently well-established and universally recognized to trigger jurisdiction for a tort suit under the ATCA, particularly in light of the higher standard articulated in the Rome Statute, I am mindful of the conclusions of these tribunals.[16]
D.
1.
Judge Korman argues that it is insufficient to inquire whether aiding and abetting is generally recognized under customary international law and that the appropriate inquiry is instead to engage in a “norm-by-norm analysis” to determine whether aiding and abetting liability exists for the violation of a particular rule. Opinion of Judge Korman at 331. Yet this is not how the inquiry is undertaken by international tribunals whose jurisdiction is limited by customary international law.
In Tadic, the Appeals Chamber of the ICTY considered whether a defendant could be held criminally responsible under international law on a common purpose or joint criminal enterprise (JCE) theory of liability. Prosecutor v. Tadic, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 185 (July 15, 1999). After concluding that the ICTY Statute permitted such liability, the tribunal turned to customary law.[17] The Appeals Chamber reviewed relevant sources of customary law includ *280 ing case law from post — World War II war crimes cases, international treaties, and the domestic law of many countries. It then concluded that “the notion of common design as a form of accomplice liability is firmly established in customary international law.” Id. ¶ 220. The Appeals Chamber made no effort, though, to distinguish among the different crimes (or even broad categories of crimes) over which it had jurisdiction or to verify the existence of JCE liability at customary law for each individual crime. Later panels have confirmed that Tadic’s review of “state practice and opinio juris ... was sufficient” to establish that “such a norm existed under customary international law.” Prosecutor v. Milutinovic, Case No. IT-99-37-AR72, Appeals Chamber Decision on Dragoljub Ojdanic’s Motion Challenging Jurisdiction — Joint Criminal Enterprise, ¶ 29 (May 21, 2003); see also Prosecutor v. Brdjanin, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶ 363 (Apr. 3, 2007).
These tribunals took the same approach with respect to the application of aiding and abetting liability. In Tadic, the ICTY trial chamber viewed international treaties and trials following the Second World War as “establishing] the basis in customary international law for both individual responsibility and of participation in the various ways provided by Article 7 of the [ICTY] Statute.” Tadic, Trial Chamber Opinion and Judgment, ¶ 669. In Furund-zija, the trial chamber consulted post— World War II case law, as well as modern authoritative international instruments, to “establish the content” of aiding and abetting liability under customary international law. Furundzija, Trial Chamber Judgment, ¶¶ 191, 195-231. In neither case did the Tribunal engage in the norm-specific inquiry advocated by Judge Korman. Indeed, the Furundzija Trial Chamber concluded that “[t]he definitions and propositions concerning aiding and abetting [it] enunciated ... apply ... to all crimes,” even though it had not purported to identify sources relating to every crime over which it had jurisdiction. Id. ¶ 250. Yet these analyses are recognized as authoritative by other chambers of the Tribunals. See, e.g., Prosecutor v. Aleksovski, Case No. IT-95-14/1-A, Appeals Chamber Judgment, ¶ 162 (Mar. 24, 2000) (noting that “[t]he liability of a person charged with aiding and abetting another person in the commission of a crime was extensively considered by Trial Chamber II in the Furundzija Judgment” and adopting its conclusions); Prosecutor v. Bagilishema, Case No. ICTR-95-1A-T, Trial Chamber Judgment, ¶ 32 n. 22 (June 7, 2001) (citing Tadic for discussion of “the customary nature of the[] principles” of aiding and abetting liability).
The international tribunals’ approach is consistent with the understanding that aiding and abetting is a theory of liability for acts committed by a third party. As we have recognized in our domestic criminal law, “aiding and abetting ‘does not constitute a discrete criminal offense but only serves as a more particularized way of identifying persons involved’ ” in the underlying offense. United States v. Smith, 198 F.3d 377, 383 (2d Cir.1999) (quoting United States v. Oates, 560 F.2d 45, 54 (2d Cir.1977) (internal quotation marks omitted)); see also Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir.2006) (explaining that “aiding and abetting is a theory for holding the person who aids and abets liable for the tort itself’). International law is consistent with domestic law on this point. See, e.g., Prosecutor v. Kunarac, Case Nos. IT-96-23-T & IT-96-23/1-T, Trial Chamber Judgment, ¶391 (Feb. 22, 2001) (“As opposed to the ‘commission’ of a crime, aiding and abetting is a form of accessory liability.”); Akayesu, Trial Chamber Judgment, ¶ 527 (defining an ac *281 complice as “someone who associates himself in an offence committed by another”); see also Hamdan, 126 S.Ct. at 2785 n. 40 (“The International Criminal Tribunal for the former Yugoslavia (ICTY), drawing on the Nuremberg precedents, has adopted a ‘joint criminal enterprise’ theory of liability, but that is a species of liability for the substantive offense (akin to aiding and abetting), not a crime on its own.”). Because aiding and abetting is a generally applicable means of identifying who should be held responsible for a particular act, rather than a necessary element of the act itself, it is more reasonable to consider whether the theory is accepted as a general principle of customary international law than to ask whether each substantive norm that proscribes a specific conduct encompasses liability for aiding and abetting. See, e.g., Rome Statute (including the provision on individual criminal responsibility in “Part III: General Principles of Criminal Law” and the definition of the substantive offenses in Part II); ICTR Statute (segregating the article defining individual criminal responsibility from the articles describing the substantive offenses); ICTY Statute (same); Draft Code of Crimes Against the Peace and Security of Mankind, Report of the International Law Commission on the work of its forty-eighth session, U.N. GAOR, 51st Sess., Supp. No. 10, U.N. Doc. A/51/10 (1996) (including the article on individual responsibility in “Part One: General Provisions” and the definitions of crimes in “Part Two: Crimes Against the Peace and Security of Mankind”).
2.
Viewing aiding and abetting in this way, as a theory of identifying who was involved in an offense committed by another rather than as an offense in itself, also helps to explain why a private actor may be held responsible for aiding and abetting the violation of a norm that requires state action or action under color of law. It is true, as we held in Kadic, that “certain forms of conduct” violate the law of nations only when undertaken by state actors or those acting under color of law. Kadic, 70 F.3d at 239. But imposing liability on private actors who aid and abet such conduct does not, contrary to Judge Korman’s suggestion, detract in any way from this requirement. Indeed, the imposition of aiding and abetting liability under international law requires “a predicate offence committed by someone other than the accomplice,” in this case, a state actor or someone acting under color of law. Akay-esu, Trial Chamber Judgment, ¶ 529. Recognizing the responsibility of private aiders and abettors merely permits private actors who substantially assist state actors to violate international law and do so for the purpose of facilitating the unlawful activity to be held accountable for their actions.
It is of no moment that a private actor could be held liable as an aider and abettor of the violation of a norm requiring state action when that same person could not be held liable as a principal. In our domestic law, it is “well settled that one may be found guilty of aiding and abetting another individual in his violation of a statute that the aider and abettor could not be charged personally with violating.” In re Nofziger, 956 F.2d 287, 290 (D.C.Cir.1992); see also United States v. Tannenbaum, 934 F.2d 8, 14 (2d Cir.1991) (“The fact that the accused does not possess the legal capacity to commit the substantive offense does not mean that he cannot be convicted ... of aiding and abetting the commission of the substantive offense by another. Thus, the inability to commit the substantive offense is immaterial.” (citations omitted)). Indeed, “[t]he doctrine is of ancient origin.” Nofziger, 956 F.2d at *282 291. International law, too, recognizes that criminality is assessed by reference to the actions of the principal, not the aider and abettor. See Akayesu, Trial Chamber Judgment, ¶ 528 (“[I]t should be understood that the physical act which constitutes the act of complicity does not have its own inherent criminality, but rather it borrows the criminality of the act committed by the principal perpetrator of the criminal enterprise.... The accomplice has not committed an autonomous crime, but has merely facilitated the criminal enterprise committed by another.”).
The defendants and the government argue that the Supreme Court’s decision in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), precludes us from recognizing aiding and abetting liability for claims brought under the ATCA because “where Congress has not explicitly provided for aider and abettor liability in civil causes of action, it should not be inferred.” See In re S. African Apartheid Litig., 346 F.Supp.2d at 550. The Court’s holding in Central Bank was primarily premised on a recognition that § 10(b) does not prohibit aiding and abetting, and “the private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b).” Central Bank, 511 U.S. at 173, 114 S.Ct. 1439. Here, however, the ATCA provides jurisdiction for the courts to hear torts “committed in violation of the law of nations.” The Supreme Court’s instruction in Central Bank that “when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant’s violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors,” 511 U.S. at 182, 114 S.Ct. 1439, is thus inapposite. Under the ATCA, the relevant norm is provided not by domestic statute but by the law of nations, and that law extends responsibility for the violations of its norms to aiders and abettors. See William R. Casto, The New Federal Common Law of Tort Remedies for Violations of International Law, 37 Rutgers L.J. 635, 650 (2006) (noting that “[t]he precise holding in Central Bank ... does not translate easily to [ATCA] litigation,” and that “at a fundamental level” Central Bank in fact suggests that a theory of aiding and abetting liability may be recognized if “a norm of international law forbids private persons to assist violators”). Thus, I conclude that customary international law recognizes liability for aiding and abetting violations of international law, and that the district court erred when it reached the contrary conclusion.
3.
Judge Korman further argues that the defendants cannot be held liable as aiders and abettors because the sources that establish accessorial liability do not extend that liability to corporations. Opinion of Judge Korman at 321. This argument was not raised by the defendants on appeal and therefore the issue was not briefed by the parties. It is perhaps not surprising that neither the defendants nor the United States raised this issue as a bar to liability: We have repeatedly treated the issue of whether corporations may be held liable under the ATCA as indistinguishable from the question of whether private individuals may be. See Bigio v. Coca-Cola Co., 239 F.3d 440, 447 (2d Cir.2000) (asking “whether Coca-Cola can have violated ‘the law of nations’ if it acted solely as a non-governmental entity”); see also Flores, 414 F.3d at 244 (making no distinction between private individuals and corporations and noting that “certain activities are of ‘universal concern’ and therefore constitute violations of customary international law not only *283 when they are committed by state actors, but also when they are committed by private individuals” (citing Kadic, 70 F.3d at 239-40)); cf. Sosa, 542 U.S. at 732 n. 20, 124 S.Ct. 2739 (classifying both corporations and individuals as “private aetor[s]”). Regardless, because the defendants have not objected to the imposition of liability on this basis, we need not reach the issue at this time.
E.
The Ntsebeza and Digwamaje Plaintiffs argue that the district court also erred in focusing on whether allegations of accesso-rial liability would support jurisdiction under the ATCA because they also brought claims of direct liability. To the extent that the court did confront these direct liability claims, it appears to have rejected them either on the ground that the plaintiffs failed to allege state action or on the ground that the treaties upon which the claims were based were not self-executing and therefore could not satisfy the ATCA’s jurisdictional prerequisite. Both of these bases appear to rest on misunderstandings of our ATCA jurisprudence.
First, it appears that the district court did not distinguish between norms of international law that apply only to state actors and those norms that proscribe conduct even when not taken under the color of law. For example, the district court held that the plaintiffs in this case “do not allege actions by the defendants that elevate them to the status of state actors in the commission of torture, genocide, killings, and other serious crimes.” In re S. African Apartheid Litig., 346 F.Supp.2d at 548-49. As we squarely held in Kadic, however, “the proscription of genocide [by customary international law] has applied equally to state and non-state actors,” and “acts of rape, torture, and summary execution ... are actionable under the [ATCA], without regard to state action, to the extent that they were committed in pursuit of genocide or war crimes.” 70 F.3d at 242, 244. It is therefore not relevant whether the plaintiffs sufficiently allege that the defendants acted under color of law in the commission of genocide as long as they sufficiently allege that the defendants committed genocide.
Second, I believe that the district court overstated the weight we have placed on the self-executing status of a treaty in our consideration of its weight as evidence of customary international law. In Flores, we explained that “a treaty that is self-executing or that has been executed through an Act of Congress — and therefore gives rise to rights legally enforceable in our courts — provides greater evidence of the customs and practices of the United States than a treaty that has not been executed.” 414 F.3d at 257. We did not hold that non-self-executing treaties are without any evidentiary value with regard to the state of current customary international law, much less that “no liability based upon any alleged violation of the[ ] norms [articulated in such treaties] can form an adequate predicate for jurisdiction under the ATCA.” In re S. African Apartheid Litig., 346 F.Supp.2d at 552. Indeed, in Kadic we relied on the Genocide Convention to determine the shape of the international proscription of genocide and made clear that “the legislative decision not to create a new private remedy does not imply that a private remedy is not already available under the [ATCA].”[18] *284 Kadic, 70 F.3d at 241-42. The relevant inquiry for establishing jurisdiction under the ATCA, as our case law makes clear, is whether the conduct alleged by the plaintiffs violates a norm “that States universally abide by, or accede[ ] to, out of a sense of legal obligation and mutual concern.” Flores, 414 F.3d at 248. Whether a treaty that embodies that norm is self-executing is relevant to, but is not determinative of, that question.
Ill
For the foregoing reasons, I join in the per curiam opinion.

. This “series of reasons” comprises (1) a change in the "prevailing conception of the common law” such that there is now "a general understanding that the law is not so much found or discovered as it is either made or created,” Sosa, 542 U.S. at 725, 124 S.Ct. 2739; (2) a "rethinking of the role of the federal courts in making it,” id. at 726, 124 S.Ct. 2739; (3) the recognition that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases,” id. at 727, 124 S.Ct. 2739; (4) the fact that "attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences,” id. at 727-28, 124 S.Ct. 2739; and (5) the lack of a "congressional mandate” to engage in judicial lawmaking in this area, id. at 728, 124 S.Ct. 2739.

. Federal courts may, of course, decline to accept jurisdiction over a particular case in appropriate circumstances and in accordance with the well-established principles that guide such decisions. I merely suggest that because federal courts "have only the jurisdiction granted to them by Congress,” Carlyle Towers Condo. Ass’n, Inc. v. FDIC, 170 F.3d 301, 306 (2d Cir.1999), their exercise of common-law *267 discretion is better viewed as creating a cause of action than jurisdiction. Cf. Bolin v. Sears, Roebuck & Co., 231 F.3d 970, 974 (5th Cir.2000) (holding that Congress's grant of authority to the Supreme Court to make rules that affect only the timing of appeals does not constilute an improper delegation of its power to confer jurisdiction).

. In Flores we noted that the law of nations, as used in the ATCA “refers to the body of law known as customary international law.” 414 F.3d at 247.

. In Kadic we assumed that the ATCA itself created the cause of action, see 70 F.3d at 246, but the same principle applies to the common law following Sosa.

. The district court seems to have dismissed the significance of some of these sources because they imposed criminal and not civil responsibility. See In re S. African Apartheid Litig., 346 F.Supp.2d at 550. This distinction finds no support in our case law, which has consistently relied on criminal law norms in establishing the content of customary international law for purposes of the ATCA. In Kadic, for instance, we held that a defendant could be held liable under the ATCA based on international criminal law norms prohibiting genocide and war crimes. Kadic, 70 F.3d at 241-42. In concluding that genocide was actionable under the ATCA, the Kadic court relied on a United Nations resolution declaring that genocide is a "crime under international law,” G.A. Res. 96(1), at 188-89, U.N. Doc. A/64 (Dec. 11, 1946), the London Charter, Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, E.A.S. 472, and the Genocide Convention, Convention on the Prevention and the Punishment of the Crime of Genocide, Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277, which confirms that "genocide, whether committed in a time of peace or in time of war, is a crime under international law which [the contracting parties] undertake to prevent and to punish,” id. at art. I (emphasis added); see Kadic, 70 F.3d at 241. Kadic also held that jurisdiction existed under the ATCA for "claims of war crimes” because "[t]he liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II,” id. at 243, notwithstanding that the Nuremberg trials were criminal proceedings and that the proscription of war crimes is self-evidently criminal in nature.
Our past reliance on criminal law norms seems entirely appropriate given that, as Justice Breyer observed in Sosa, international law does not maintain the kind of hermetic seal between criminal and civil law that the district court sought to impose. See Sosa, 542 U.S. at 762-63, 124 S.Ct. 2739 (Breyer, J., concurring). "[T]he criminal courts of many nations combine civil and criminal proceedings, allowing those injured by criminal conduct to be represented, and to recover damages, in the criminal proceeding itself.” Id. Moreover, the ICTY has recognized the propriety of civil remedies for violations of international criminal law in certain circumstances, noting for example that a torture victim might "bring a civil suit for damage in a foreign court.” Prosecutor v. Furundzija, Case No. IT-95-17/1, Trial Chamber Judgment, II155 (Dec. 10, 1998).

. The United States also notes that the law governing the initial military commissions es *271 tablished to prosecute acts of international terrorism following the September 11 attacks recognized aiding and abetting as a mode of liability. See Crimes and Elements for Trials by Military Commission, 32 C.F.R. § 11.6(c)(1) (2003). The jurisdiction of the military tribunals was limited to established violations of the law of war or to "offenses that, consistent with that body of law, are triable by military commission.” 32 C.F.R. § 11.3(a). The law of war has long been recognized as a subset of international law. See Ex parte Quirin, 317 U.S. 1, 27-28, 63 S.Ct. 2, 87 L.Ed. 3 (1942) ("From the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals.”). While the Supreme Court eventually found that the military commissions lacked the power to proceed, see Hamdan v. Rumsfeld,-U.S.-, 126 S.Ct. 2749, 2759, 165 L.Ed.2d 723 (2006), nothing in that decision addressed the propriety of including aiding and abetting liability as part of the commissions' jurisdiction.

. The fact that some of these treaties do not directly criminalize aiding and abetting, but instead require state parties to criminalize it in their domestic law, see, e.g., United Nations Convention Against Transnational Organized Crime, art. 5, G.A. Res. 55/25, at 5-6, U.N. Doc. A/RES/55/25 (Jan. 8, 2001) ("Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences ... aiding, abetting, facilitating or counselling the commission of serious crime involving an organized criminal group.”), does not limit their value as relevant sources of customary international law. Customary international law addresses "those wrongs that are of mutual, and not merely several, concern to States,” Flores, 414 F.3d at 249 (internal quotation marks and emphases omitted), and where states join a binding agreement to enforce a mode of liability in their domestic law, that decision reflects a matter of mutual, not several, concern and is thus properly considered a subject of customary international law. See id. ("Matters of mutual concern between States are those involving States' actions performed towards or with regard to the other.... Matters of several concern among States are matters in which States are separately and independently interested.” (citation and internal quotation marks omitted)).

. The Security Council did ''elect[] to take a more expansive approach to the choice of the applicable law” with respect to punishable violations by providing for liability for violations of Additional Protocol II and common article 3 of the Geneva Convention despite the fact that Additional article II had "not yet been universally recognized as part of customary international law,” and violations of common article 3 had never before been criminalized. Report of Secretary-General Pursuant to Paragraph 5 of Security Council Resolution 955, ¶ 12, UN doc. S/1995/134 (Feb. 13, 1995). With respect to individual responsibility, though, the Security Council adhered to customary law by adopting the language used in the ICTY Statute.

. The United States has not ratified the Rome Treaty for reasons unrelated to any concern over the definition of aiding-and-abetting. See Brief for the United States as Amicus Curiae, at 24 n. 14; see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 374 F.Supp.2d 331, 339-40 (S.D.N.Y.2005) ("[T]he United States feared 'unchecked power in the hands of the prosecutor’ that could lead to ‘politicized prosecution.' ”). Indeed, the Amicus Brief appears to endorse the elements set out in Article 25(3). Brief for the United States as Amicus Curiae, at 26.

. The same standard was also adopted by the United Nations Transitional Administration in East Timor (“UNTAET”). See UN-TAET Reg. No.2000/15 § 14.3(c).

. There are occasions when this intent could be inferred from such sales. In Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), the Supreme Court held that the sale of restricted goods with an inherent capacity for harm, such as the opiates involved in that case, combined with other factors, may be sufficient to prove that the seller was engaged in a conspiracy with the buyer. Id. at 711, 63 S.Ct. 1265. Nevertheless, it observed that “not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy.” Id. at 712, 63 S.Ct. 1265. For example, the Court held that a conspiracy charge might not lie against a company engaged in a "continuous course of sales, made either with strong suspicion of the buyer’s wrongful use or with knowledge, but without stimulation or active incitement to purchase.” Id. at 712 n. 8, 63 S.Ct. 1265. On the other hand, sales of unlimited quantities stimulated "by all the high-pressure methods, legal if not always appropriate in the sale of free commodities,” id. at 712, 63 S.Ct. 1265, would suffice to support such a charge. Another example that would suffice is the Zyklon B case, Trial of Bmno Tesch and Two Others, in 1 Law Reports of War Criminals 93 (William S. Hein & Co., Inc. 1997) (1946), where the principal defendant not only supplied prussic acid to the S.S. but undertook to train its members how it could be used to kill human beings. Id. at 95.

.These Tribunals would also extend liability to individuals who merely had "knowledge that [their] acts assist the commission of the specific crime of the principal.” Prosecutor v. Vasiljevic, Case No. IT-98-32-A, Appeals Chamber Judgment, ¶ 102(h) (Feb. 25, 2004). Any individual who acts with the purpose to facilitate the commission of a crime would necessarily act with such knowledge. Thus, I do not view the articulation of a broader definition by the ICTY as detracting from my position that liability in accordance with the purposefulness standard is well-established *277 and universally recognized under international law. The critical question is whether there is a discernable core definition that commands the same level of consensus as the 18th-century crimes identified by the Supreme Court in Sosa. See Sosa, 542 U.S. at 732, 124 S.Ct. 2739. I believe that the standard I adopt is such a definition. Cf. United States v. Smith, 18 U.S. (5 Wheat.) 153, 161, 5 L.Ed. 57 (1820) (noting that “whatever may be the diversity of definitions, in other respects, ail writers concur, in holding, that robbery, or forcible depredations upon the sea, animo furandi, is piracy”).

. In light of this conclusion, I need not address the plaintiffs' argument that a theory of aiding and abetting liability could be supplied by domestic federal common law even if such liability did not exist under international law.

. The Appeals Chamber, which is shared by both the ICTY and the ICTR, has made clear that the same law relating to modes of liability applies in both Tribunals. See Prosecutor v. Ntakirutimana, Case Nos. ICTR-96-10-A, ICTR-96-17-A, Appeals Chamber Judgment, ¶ 468 (Dec. 13, 2004) ("Given the fact that both the ICTY and the ICTR have mirror articles identifying the modes of liability by which an individual can incur criminal responsibility, the Appeals Chamber is satisfied that the jurisprudence of the ICTY should be applied to the interpretation of Article 6(1) of the ICTR Statute.”).

. I note a possible tension in the tribunals' definition aiding and abetting under which the necessary mens rea is knowing assistance, Vasiljevic, Appeals Chamber Judgment, ¶ 102(ii), yet requires that the act of assistance be "specifically directed to assist ... the perpetration of a specific crime,” id. V 102(i). I express no view on how, if at all, this possible tension might be resolved.

. I note further that other federal courts have consulted decisions of the ICTY and ICTR in determining whether various rules are part of customary international law. See, e.g., Hamdan, 126 S.Ct. at 2785 n. 40 (ICTY); Sosa, 542 U.S. at 762, 124 S.Ct. 2739 (Breyer, J. concurring) (ICTY); Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1290-93 (11th Cir.2002) (ICTY and ICTR); Tagaga v. INS, 228 F.3d 1030, 1035 n. 10 (9th Cir.2000) (ICTY); Almog, 471 F.Supp.2d at 286 (noting that "[sjtandards for imposing liability where a non-primary actor is alleged to be liable for a violation of the law of nations emerge from,” in part, the ICTY and ICTR case law); Presbyterian Church of Sudan, 453 F.Supp.2d at 666-68 (analyzing ICTY cases to determine the elements of aiding and abetting liability under international law); In re "Agent Orange” Prod. Liab. Litig., 373 F.Supp.2d at 54 (same); Mehinovic v. Vuckovic, 198 F.Supp.2d 1322, 1356 (N.D.Ga.2002).

. See Prosecutor v. Milutinovic, Case No. IT-99-37-AR72, Appeals Chamber Decision on Dragoljub Ojdanic’s Motion Challenging Jurisdiction - Joint Criminal Enterprise, ¶ 17 (May 21, 2003) (noting that each chamber has a "duty to ascertain that a ... form of liability charged in the indictment is both provided for under the Statute and that it existed at the relevant time under customary international law.”).

. Apparently recognizing that the Genocide Convention may be used to support the existence of genocide as a violation of the law of nations, Judge Korman nonetheless suggests that the district court should not recognize a cause of action for genocide because “Congress has quite plainly indicated its intention that such a cause of action should not be *284 available” through its passage of the Genocide Convention Implementation Act, 18 U.S.C. § 1091. Opinion of Judge Korman at 321; see also 18 U.S.C. § 1092 (providing that nothing in the Act should be “construed as creating any substantive or procedural right enforceable by law by any party in any proceeding”). It is unnecessary to resolve this issue as part of the jurisdictional analysis, and I would leave it to the district court to address in the first instance should it undertake to decide whether to recognize a cause of action.